48 A.3d 312

JOYCE MCDOUGALL, PLAINTIFF–APPELLANT, v. CHARLOT LAMM, DEFENDANT–RESPONDENT.

Argued January 4, 2012—Decided July 31, 2012.

*Lewis Stein* argued the cause for appellant (*Nusbaum, Stein, Goldstein, Bronstein & Kron,* attorneys).

*Brian R. O'Toole* argued the cause for respondent (*O'Toole & Couch,* attorneys).

Justice HOENS delivered the opinion of the Court.

In this appeal, we are asked to consider whether a pet owner should be permitted to recover for emotional distress caused by observing the traumatic death of that pet. Asserting that pets have achieved an elevated status that makes them companions in the lives of human beings, plaintiff Joyce McDougall asks this Court to hold that pets should no longer be considered to be mere personal property. With that fundamental shift in the way that pets are seen in the eyes of the law as her backdrop, plaintiff asks

us to permit her to recover for the emotional distress she endured after she watched her dog as it was shaken to death by a larger dog.

The basis in our law for recovering emotional distress damages arising out of observing the traumatic death of another was first expressed by this Court in *Portee v. Jaffee,* 84 *N.J.* 88, 417 *A.*2d 521 (1980). Since that time, the doctrine has been narrowly applied and we have carefully limited the circumstances in which such relief is available. In considering potential expansions of the relief permitted under *Portee,* we have never concluded that it can be applied to the observation of a death, however traumatic, by one who did not share a close familial relationship or intimate, marital-like bond with the victim.

The question that we confront today is whether a bond with a pet meets that carefully circumscribed criteria. Although we recognize that many people form close bonds with their pets, we conclude that those bonds do not rise to the level of a close familial relationship or intimate, marital-like bond. We therefore decline to expand the traditionally and intentionally narrow grounds established in *Portee* to include claims arising from the death of a pet.

We reach this conclusion for three essential reasons. First, we do so because expanding the cause of action recognized in *Portee* to include pets would be inconsistent with the essential foundation of the *Portee* claim itself. Second, creating a cause of action based on observing the death of a pet would result in an ill-defined and amorphous cause of action that would elevate the loss of pets to a status that exceeds the loss of all but a few human beings. Third, creating a new common law cause of action of this type would conflict with expressions of our Legislature found in both the statutory cause of action designed to address wrongful death of humans and in the statutes that govern rights and responsibilities of dog owners.

The bond shared between humans and animals is often an emotional and enduring one. Permitting it to support a recovery

for emotional distress, however, would require either that we vastly expand the classes of human relationships that would qualify for *Portee* damages or that we elevate relationships with animals above those we share with other human beings. We conclude that neither response to the question presented would be sound.

## I.

The essential facts were developed in the course of a bench trial during which only plaintiff testified. Because plaintiff's claim for emotional distress had been dismissed prior to trial, that proceeding was limited to the receipt of evidence about the events that led to the dog's death and the value of plaintiff's dog. Nonetheless, the evidence is sufficient to permit us to evaluate the basis for plaintiff's appeal to this Court.

On June 7, 2007, plaintiff was walking along a street in Morris Plains with her dog Angel, a nine-year old "maltipoo." [1] According to plaintiff, a large dog, belonging to defendant Charlot Lamm, ran out from defendant's house. That dog, which was growling and snarling, stopped and sniffed plaintiff's dog, then looked at her and paused. After a moment, the larger dog grabbed plaintiff's dog by the neck, picked it up and shook it several times before dropping it and returning to defendant's yard. According to plaintiff, she screamed and tried to figure out if she could help

---

[1] A "maltipoo" is a dog that is half maltese and half poodle. Although both popular and commonly available, it is not a breed of dog that has been standardized and is not recognized by the American Kennel Club. American Kennel Club, *Complete Breed List*, http://www.akc.org/breeds/complete_breed_list.cfm (last visited July 9, 2012) (listing recognized breeds and setting forth factors considered for recognition by the AKC Board of directors); *see* Jon Mooallem, *The Modern Kennel Conundrum*, N.Y. Times Magazine, Feb. 4, 2007, *available at* http://www.nytimes.com/2007/02/04/magazine/04dogs.t.html?_r=1&ei=5087% 0A&em=&en=87aede8ea631b413&ex=1170824400&pagewanted=all (discussing standardized breeds and creation and popularity of "designer dogs"). Rather, the type of dog is defined only by the fact that it is the product of that particular parentage.

the dog before attempting to telephone for help. She later learned that her dog had died.

Plaintiff bought the dog in 1997 from a neighbor whose maltese had been bred to a poodle and who had previously sold such puppies to others in the neighborhood. Plaintiff testified that she paid $200 for the dog as a puppy and she was permitted to testify that she believed, based on her research on the internet, that a new puppy would cost an average of $1,395.

At the time plaintiff acquired the dog, she lived with her husband and three sons. Plaintiff and her husband later separated and her three children all grew to adulthood and moved out of the home, at which point plaintiff lived alone with the dog. Plaintiff described the dog as a "friendly, lively, energetic dog" that loved children. She also described the dog as being highly trained and capable of performing many tricks that it had been taught by plaintiff and her family. Plaintiff also testified that she has not replaced the dog since the incident that led to the dog's death.

Because of the limited focus of the trial, plaintiff did not offer evidence about the nature or extent of her emotional distress, but she did testify about her relationship with the dog. According to that testimony, the dog was very happy to see her when she came home, the dog slept in a bed near hers in the bedroom, and the dog was with her much of the time because she did not work outside of the home.

Plaintiff's complaint alleged in its first count that defendant was negligent in maintaining her dog and demanded compensatory damages. In the second count of the complaint, plaintiff alleged that, as a result of witnessing the events up to and including the dog's death, she suffered significant and continuing emotional distress and discomfort and demanded damages for that emotional distress.

Defendant moved for partial summary judgment, seeking dismissal of plaintiff's emotional distress claim. In ruling on that

motion, the court noted that the law categorizes dogs as a form of personal property. Although expressing sympathy to plaintiff for the loss she felt, the court observed that there is no cause of action in New Jersey that permits an emotional distress claim based on the loss of property. For those reasons, the court dismissed plaintiff's emotional distress claim and limited plaintiff's claim for damages to the dog's intrinsic value.

Thereafter, defendant stipulated to liability and both parties waived their right to a jury trial. At the close of the evidence, the court placed its findings and conclusions on the record. In determining the appropriate measure of damages, the court considered the original and replacement costs for the dog as well as the value of the extent of the dog's training and the tricks it could perform. In particular, the court recognized that "the loss and [plaintiff's] expectation of having the benefit of these ... tricks and desirable behaviors in a companion over the course of many years," was relevant to the quantum of damages. Taking these factors into account, the court found that it would be inappropriate to limit the award of damages to the dog's replacement cost because that would not compensate plaintiff for the loss of a well-trained pet. After weighing these considerations, the court awarded plaintiff $5,000 in compensatory damages.

Plaintiff appealed the dismissal of her emotional distress claim, arguing that although New Jersey does not permit a pet owner such as plaintiff to recover for emotional distress, the better rule would be to recognize the cause of action for the loss of a companion dog. In opposition, defendant argued that the law is clear that only economic damages can be recovered for the loss of a pet. Defendant urged the appellate panel not to permit plaintiff's claim to proceed, warning that it would set a dangerous precedent to expand the scope of bystander recovery to non-humans.

The Appellate Division affirmed the judgment of the trial court in an unpublished opinion, holding that plaintiff's damages are limited to the lost value of the dog. In reaching its decision, the

panel began with its observation that the parameters that govern any claim for a bystander's recovery for emotional distress, first set forth by this Court in *Portee*, have been strictly limited. Turning to the framework established for determining whether it is appropriate to recognize a new cause of action, *see Kelly v. Gwinnell*, 96 *N.J.* 538, 544–45, 476 *A.*2d 1219 (1984), the panel concluded that none of the factors that make up that framework would support recognizing the claim that plaintiff sought to pursue.

In its evaluation, the appellate panel observed that the nature of the risk of an attack by another dog and the need to control other dogs are addressed by statutes governing dogs. In addition, the panel concluded that an evaluation of whether there are societal interests that militate in favor of creating a remedy of the type plaintiff requests as a deterrent to irresponsible pet owners is more appropriately addressed by this Court or the Legislature. As a result, the appellate panel declined to expand the existing emotional distress claim to permit plaintiff to proceed on that count of her complaint.

## II.

Plaintiff raises three arguments in support of her request that bystander recovery for negligent infliction of emotional distress be expanded to include a dog owner who witnesses the death of a companion dog.

First, plaintiff argues that an owner's relationship with a companion dog or other pet should be considered to be a close familial relationship of the kind this Court recognized was essential to the cause of action in *Portee*. She contends that pets should no longer be considered to be mere personal property and that a person's relationship with a pet is of a higher order than any relationship with inanimate property. She asserts that pets are therefore entitled to different treatment in tort law. Plaintiff contends that if a person suffers a serious emotional response to witnessing an

accident in which a loved one is killed, the identity of the loved one should be of no consequence to the right to recover.

Second, plaintiff argues that the decisions in other jurisdictions that have not allowed a claim of emotional distress for the death or serious injury of a pet are easily distinguished from the framework established by this Court in *Portee, supra*, 84 *N.J.* at 98, 417 *A.*2d 521. She urges this Court to adopt the logic and policy rationale found in the cases in which other jurisdictions have recognized a cause of action for emotional distress relating to the death of a pet, asserting that they represent the sounder reasoning and the better approach to the question.

Finally, plaintiff argues that public policy concerns about a potential flood of litigation that will overload already burdened courts are unwarranted, and asks this Court to reject them as lacking in merit.

Defendant raises four arguments in opposition to plaintiff's position and in support of the assertion that the Appellate Division properly held that plaintiff's damages are limited to the monetary value of the dog.

First, defendant argues that New Jersey law treats pets, including companion dogs, as chattel, which limits the measure of compensatory damages to the value of the dog. Defendant explains that monetary recovery for pecuniary losses does not permit consideration of such factors as sympathy or other intangible elements and that permitting the cause of action sought by plaintiff would do so.

Second, defendant argues that the Court should not consider creating a new emotional distress claim for pet owners because it would be inconsistent with the New Jersey Wrongful Death Act, *N.J.S.A.* 2A:31-1 to -6. Because that statutory cause of action limits recovery for the death of a human to economic loss and does not permit recovery for mental illness, grief, or loss of companionship, *see, e.g., Carey v. Lovett*, 132 *N.J.* 44, 67-68, 622 *A.*2d 1279 (1993); *Gangemi v. Nat'l Health Labs., Inc.*, 291 *N.J.Super.* 569,

575–76, 677 *A.*2d 1163 (App.Div.1996), defendant argues that the Court should not create a more expansive standard for the death of a pet.

Third, defendant argues that public policy considerations weigh against creating the requested cause of action for emotional distress. She points out that the Legislature has already addressed the societal interest in encouraging dog owners to control their animals through statutes governing dogs.

Finally, defendant argues that the Court's decision in *Portee, supra,* 84 *N.J.* at 98, 417 *A.*2d 521, was concerned solely with the relationships between humans and that it was intentionally limited to emotional distress claims arising from personal relationships with other people. She warns that creating a new cause of action will cause a dramatic increase in litigation in part because it will be difficult, if not impossible, to articulate the elements of such a claim, leaving too many questions for future cases and threatening to overly expand *Portee* to include all types of property.

### III.

We begin our consideration of the issue raised on appeal with an explanation of the historical developments relating to the *Portee* doctrine, following which we consider the role that pets play in the lives of their owners and whether recognizing the cause of action plaintiff requests would be consistent with *Portee.*

### A.

Historically, plaintiffs could only recover for emotional anguish arising from a defendant's negligence if the plaintiff suffered some form of physical injury in addition to the emotional injury. *See Jablonowska v. Suther,* 195 *N.J.* 91, 102, 948 *A.*2d 610 (2008) (citing *Ward v. W. Jersey & Seashore R.R. Co.,* 65 *N.J.L.* 383, 384, 47 *A.* 561 (Sup.Ct.1900)). The requirement that emotional injury be accompanied by a physical injury arose in part from a policy concern that emotional injuries could be more " 'easily feigned

without detection.' " *Ibid.* (quoting *Ward, supra,* 65 *N.J.L.* at 386, 47 *A.* 561).

The historical physical injury requirement was eventually replaced by a requirement that the plaintiff be within the "zone of risk," but this was only a permissible substitute if accompanied by the risk of substantial bodily injury or sickness. *See Caputzal v. Lindsay Co.,* 48 *N.J.* 69, 76–77, 222 *A.*2d 513 (1966) (holding that water softener manufacturer could not be held liable for plaintiff's heart attack, which resulted from his anxiety that his tap water had poisoned him); *Falzone v. Busch,* 45 *N.J.* 559, 569, 214 *A.*2d 12 (1965) (permitting recovery if plaintiff placed in reasonable fear of personal injury).

The evolution in the requirements for an emotional distress claim culminated in this Court's decision in *Portee, supra,* 84 *N.J.* at 97–98, 417 *A.*2d 521. The facts that the Court considered in *Portee* give context to the decision and illustrate the reasons that supported it. Plaintiff's son was trapped between the outer door of an elevator and the wall of the elevator shaft and was dragged between floors. *Id.* at 91, 417 *A.*2d 521. Police attempts to rescue the child continued for four and one-half hours, during which plaintiff heard her son moan and cry out and saw him as he flailed his arms. Eventually, she watched helplessly as her child died. *Ibid.* After her son's death, the plaintiff became severely depressed and self-destructive. *Id.* at 91–92, 417 *A.*2d 521.

Among other claims, the plaintiff in *Portee* filed suit seeking to recover damages for her mental and emotional distress. *Id.* at 92, 417 *A.*2d 521. Although both the trial and appellate courts dismissed plaintiff's claims, this Court reversed, holding that she had stated a claim for negligent infliction of emotional distress. *Id.* at 98–99, 417 *A.*2d 521. Relying on a decision of the California Supreme Court, *id.* at 97–101, 417 *A.*2d 521 (citing and discussing *Dillon v. Legg,* 68 *Cal.*2d 728, 69 *Cal.Rptr.* 72, 441 *P.*2d 912, 920 (1968)), this Court identified four elements that a plaintiff must prove to recover for emotional distress as a bystander: "(1) the death or serious physical injury of another caused by defendant's

negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Id.* at 101, 417 *A*.2d 521. In the three decades since *Portee* was decided, the four-element test has remained in place as the framework for a bystander's emotional distress claim in New Jersey.

█ The four elements were intentionally designed to create a narrow class of claimants who could be readily identified, to fix criteria that could not be easily feigned, and to identify those who were foreseeable plaintiffs. *See id.* at 97–101, 417 *A*.2d 521; *see also* J. Mark Appleberry, Note, *Negligent Infliction of Emotional Distress: A Focus on Relationships*, 21 *Am. J.L. & Med.* 301, 309–10 (1995) (discussing relationship of *Dillon* elements to foreseeability). Therefore, "recovery for negligent infliction of emotional harm requires that it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons." *Decker v. Princeton Packet, Inc.*, 116 *N.J.* 418, 430, 561 *A*.2d 1122 (1989).

Because this appeal only requires consideration of whether a pet can fulfill *Portee*'s requirement that the relationship qualify as "a marital or intimate[ ] familial" one, *Portee, supra*, 84 *N.J.* at 101, 417 *A*.2d 521, we focus only on that element. In *Portee,* this Court described the existence of an intimate familial relationship as the "most crucial" of the four inquiries. *Id.* at 98–99, 417 *A*.2d 521. We explained that "the presence of deep, intimate, familial ties between the plaintiff and the physically injured person ... makes the harm to emotional tranquility so serious and compelling." *Ibid.* We held that an intimate familial relationship is "an essential element of a cause of action for negligent infliction of emotional distress." *Id.* at 99, 417 *A*.2d 521.

Four years after *Portee* was decided, the Appellate Division considered the degree of the relationship necessary to recover as a bystander under the *Portee* theory. *See Eyrich ex rel. Eyrich v. Dam,* 193 *N.J.Super.* 244, 255–59, 473 *A*.2d 539 (App.Div.), *certif.*

*denied,* 97 *N.J.* 583, 483 *A.*2d 127 (1984). The plaintiffs in *Eyrich* asserted that they had a close relationship with their five-year-old neighbor and that they viewed him as the son they never had. *Id.* at 247–48, 473 *A.*2d 539. The question was whether that relationship sufficed for *Portee* purposes after they saw the child attacked and mauled by a circus animal. *Id.* at 251–52, 473 *A.*2d 539. In concluding that it did not, the appellate panel drew a distinction between the two plaintiffs. The court permitted Mr. Eyrich's claim to proceed because he attempted to save the child, thus entitling him to the status of rescuer that served as an independent ground for recovery. *Id.* at 255–59, 473 *A.*2d 539. The Appellate Division barred Mrs. Eyrich's claim, however, because she was not involved in the rescue and because she was "not bound to the child by intimate family ties," thus precluding her from bystander recovery. *Id.* at 259–61, 473 *A.*2d 539.

This Court thereafter considered the scope of relationships that meet the test of an "intimate familial" one in a claim for emotional distress by plaintiff who witnessed the death of her fiancé. *Dunphy v. Gregor,* 136 *N.J.* 99, 103–14, 642 *A.*2d 372 (1994). We recognized that New Jersey courts had applied the *Portee* elements restrictively, *id.* at 106, 642 *A.*2d 372, but concluded that a plaintiff who was engaged to and cohabiting with the victim had a sufficiently close relationship to proceed with her claim. *Id.* at 115, 642 *A.*2d 372. We did so in part because we declined to draw an arbitrary line between married and unmarried persons, *id.* at 108, 642 *A.*2d 372, but we left it to the jury to decide whether the particular relationship sufficed, *id.* at 111–12, 642 *A.*2d 372. Even so, we were careful to explain the evaluation of the relationship must be considered in light of the degree of intimacy required. *Id.* at 112, 642 *A.*2d 372. We stressed that

> this critical determination must be guided as much as possible by a standard that focuses on those factors that identify and define the intimacy and familial nature of such a relationship. That standard must take into account the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and ... 'whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship,

and the manner in which they related to each other in attending to life's mundane requirements.'

[*Ibid.* (quoting *Dunphy v. Gregor,* 261 *N.J.Super.* 110, 123, 617 *A.*2d 1248 (App.Div. 1992)).]

Ultimately, we concluded that persons engaged to be married and living together may fall into the category of relationships that are deep, enduring, and genuinely intimate, and that therefore the relationship could be one that would meet *Portee*'s requirement that the harm to the bystander be foreseeable. *Id.* at 109–10, 417 *A.*2d 521.

Our most recent discussion of the *Portee* doctrine came in the context of our analysis of a plaintiff's effort to recover for emotional distress arising from an automobile accident in which she witnessed her mother's injury, suffering and death as they were trapped in their vehicle. *See Jablonowska, supra,* 195 *N.J.* at 95–97, 948 *A.*2d 610. There, we considered the interplay between plaintiffs' conceded lack of a sufficient physical injury to meet the verbal threshold requirement found in the Automobile Insurance Cost Reduction Act of 1998, *N.J.S.A.* 39:6A–8(a), and the cognizability of a *Portee* claim, *Jablonowska, supra,* 195 *N.J.* at 105–12, 948 *A.*2d 610. Our conclusion that the *Portee* claim was independent of the verbal threshold requirements did not require us to consider the sufficiency of the familial relationship.

As these precedents make plain, our analysis of the nature of the relationship between the claimant and the decedent has been carefully limited; not even all humans are engaged in a relationship that is sufficiently close to support such an award. The question, then, is whether plaintiff has identified good and sound reasons to extend the scope of the *Portee* claim to pets.

## B.

We begin with an analysis of the essential underpinnings on which plaintiff bases her request that we recognize this cause of action. Those points, for our analytical purposes, include her contentions about the role that pets play in the lives of their

owners and the principles identified in the decisions reached by other jurisdictions that have confronted the question now before this Court.

Plaintiff's arguments concerning the expansion of the *Portee* cause of action rest on the assertion that pets play a role in the lives of their owners that cannot be equated with property and that the loss of a pet therefore cannot be fairly compensated by resort to property loss principles. Fundamental to this aspect of her argument is the implicit assumption that there is a class of animals, referred to as companion animals, *see* Debra Squires–Lee, Note, *In Defense of Floyd: Appropriately Valuing Companion Animals in Tort*, 70 *N.Y.U. L.Rev.* 1059, 1059 & n. 2 (1995) (explaining genesis and implications of companion animal designation), with which an owner, referred to as an animal guardian, *id.* at 1062, interacts in a manner akin to a relationship with other humans, *id.* at 1062–63.

Those underlying presumptions, in turn, give rise to the argument that courts must abandon the historical legal categorization of pets as a form of property and permit compensation commensurate with the special status to which their role in the lives of humans is entitled. *Ibid.* In attempting to define the features by which courts can identify companion animals, and thereby distinguish between them and any other kind of animals with which people interact, the commentators on this subject have suggested that we look to

> the relationship that they share with their guardians. Humans and companion animals share their lives; daily emotional and social interactions establish a bond and a connection. 'With companion animals it is the relationship itself which is important to the owner.' Each relationship depends on the personalities and nature of the individuals involved.
>
> [*Id.* at 1065 (citation omitted).]

Although plaintiff does not expressly ask this Court to embrace this theory or the definitions it proposes, her arguments on appeal require us to recognize this underlying premise as part of our analysis of whether plaintiff's proposed cause of action comports

with our existing *Portee* jurisprudence and how adopting it would work in practice.

Plaintiff does expressly invite this Court to find persuasive the reasoning of those jurisdictions that have permitted recovery in circumstances similar to her own, while rejecting the reasoning of the majority of other jurisdictions that have declined to do so. Numerous other jurisdictions have considered whether to permit recovery for emotional distress for pet owners witnessing the death or injury of their pet. *See* Jay M. Zitter, *Recovery of Damages for Emotional Distress Due to Treatment of Pets and Animals*, 91 *A.L.R.* 5th 545, [3] (2012) (collecting cases).

The majority of jurisdictions that have considered whether pet owners should be permitted to recover for emotional distress arising from the death of the pet have declined to authorize the cause of action. *See, e.g., Kaufman v. Langhofer,* 223 *Ariz.* 249, 222 *P.*3d 272, 279 (Ariz.Ct.App.2009) (holding that "we are unwilling to expand Arizona common law to allow a plaintiff to recover emotional distress or loss of companionship damages for a pet negligently injured or killed"); *Nichols v. Sukaro Kennels,* 555 *N.W.*2d 689, 691–92 (Iowa 1996) (electing to follow majority of jurisdictions in denying recovery for mental distress); *Koester v. VCA Animal Hosp.,* 244 *Mich.App.* 173, 624 *N.W.*2d 209, 211–12 (2000) (declining to recognize cause of action); *Fackler v. Genetzky,* 257 *Neb.* 130, 595 *N.W.*2d 884, 892 (1999) (denying recovery for emotional damages for death of animal); *Jason v. Parks,* 224 *A.D.*2d 494, 638 *N.Y.S.*2d 170, 170 (N.Y.App.Div.1996) (same); *Strawser v. Wright,* 80 *Ohio App.*3d 751, 610 *N.E.*2d 610, 612 (1992) (same); *Miller v. Peraino,* 426 *Pa.Super.* 189, 626 *A.*2d 637, 640 (1993) (same); *Kondaurov v. Kerdasha,* 271 *Va.* 646, 629 *S.E.*2d 181, 187 n. 4 (2006) (collecting cases that decline to recognize cause of action because animals are deemed personal property); *Pickford v. Masion,* 124 *Wash.App.* 257, 98 *P.*3d 1232, 1235 (2004) (denying recovery for loss of companionship); *Carbasho v. Musulin,* 217 *W.Va.* 359, 618 *S.E.*2d 368, 371 (2005) (denying recovery for emotional damages for death of animal);

*Rabideau v. City of Racine*, 243 *Wis.*2d 486, 627 *N.W.*2d 795, 802 (2001) (same); *see also* William C. Root, Note, *"Man's Best Friend": Property or Family Member? An Examination of the Legal Classification of Companion Animals and its Impact on Damages Recoverable for Their Wrongful Death or Injury*, 47 *Vill. L.Rev.* 423, 426–29 (2002) (summarizing jurisdictions that disallow cause of action based on emotional distress).

In articulating the basis for their rejection of the proposed cause of action, courts in these jurisdictions have offered a variety of explanations. First, some courts have adhered to the historical principle of law that regards pets, even if seen by their owners as companions, as being simply a form of personal property. *See Roman, supra,* 621 *P.*2d at 308; *Fackler, supra,* 595 *N.W.*2d at 892; *Kondaurov, supra,* 629 *S.E.*2d at 187; *Rabideau, supra,* 627 *N.W.*2d at 798; *see also Root, supra,* 47 *Vill. L.Rev.* at 423. Two courts pointed out that their discretion was confined by a statute defining dogs as property. *Oberschlake v. Veterinary Assoc. Animal Hosp.,* 151 *Ohio App.*3d 741, 785 *N.E.*2d 811, 812–13 (2003) (quoting statute that equated dogs with property akin to livestock); *Carbasho, supra,* 618 *S.E.*2d at 371 (concluding that because dogs are personal property by statute for tax purposes and by case law, damages for death when struck by motorist are limited to fair market value and do not include sentimental value or emotional distress).

Second, courts have also cited public policy concerns as part of the premise for their rejection of the cause of action. Among the public policy considerations identified are the concerns that our "enormous capacity to form bonds with dogs, cats, birds and an infinite number of other beings that are non-human" would make it impossible to define the boundaries of the cause of action, *Rabideau, supra,* 627 *N.W.*2d at 798–99; that "the difficulty in defining classes of persons entitled to recover, and classes of animals for which recovery should be allowed" supported rejecting the cause of action entirely, *Pacher v. Invisible Fence of Dayton,* 154 *Ohio App.*3d 744, 798 *N.E.*2d 1121, 1125 (2003); that recognizing the cause of action would open the door to claims for non-

economic damages for the loss of other kinds of property, *Johnson v. Douglas,* 187 *Misc.*2d 509, 723 *N.Y.S.*2d 627, 628 (Sup.Ct.N.Y. 2001); and that it would burden courts unnecessarily with a greater caseload, *ibid.; see also Root, supra,* 47 *Vill. L.Rev.* at 431. One state's courts relied in part on policy considerations expressed in a decision from our Law Division rejecting a wrongful death claim arising from the death of a pet. *See Oberschlake, supra,* 785 *N.E.*2d at 815 (commenting on policy concerns identified in *Harabes v. Barkery, Inc.,* 348 *N.J.Super.* 366, 371, 791 *A.*2d 1142 (Law Div.2001)); *accord Pacher, supra,* 798 *N.E.*2d at 1125–26 (same).

In some of the jurisdictions that have denied recovery to pet owners for emotional distress, the holding was based on factors other than the involvement of a companion animal. *See, e.g., Altieri v. Nanavati,* 41 *Conn.Supp.* 317, 573 *A.*2d 359, 361 (1989) (concluding that claim arising from performance of unauthorized surgery by veterinarian was akin to medical malpractice claim for which no bystander liability attached); *Gill v. Brown,* 107 *Idaho* 1137, 695 *P.*2d 1276, 1277 (Idaho Ct.App.1985) (concluding that bystander claim required plaintiff to suffer physical injury that was absent from record about donkey being shot); *Lachenman v. Stice,* 838 *N.E.*2d 451, 460 (Ind.Ct.App.2005) (dismissing claim because plaintiff suffered no physical impact), *trans. denied,* 855 *N.E.*2d 1008 (Ind.2006); *Soucek v. Banham,* 503 *N.W.*2d 153, 164 (Minn.Ct.App.1993) (denying claim for negligent infliction of emotional distress because plaintiff was not in "zone of danger" and did not have required physical manifestations of emotional distress); *see also Nichols, supra,* 555 *N.W.*2d at 691 (distinguishing cases that recognized cause of action and following majority approach).

Although the great majority of decisions around the country have rejected plaintiffs' requests that they recognize a cause of action for emotional distress based on the death of a pet, a few states [2] have reached the opposite conclusion and have permitted

---

[2] In two states, the cause of action is statutory, *see* 510 *Ill. Comp. Stat.* 70/16.3; *Tenn.Code Ann.* 44–17–403, as a result of which we do not consider them for

plaintiffs to recover for the emotional distress resulting from the loss of pet. *See Knowles Animal Hosp. v. Wills*, 360 *So.*2d 37, 38 (Fla.Dist.Ct.App.1978); *Campbell v. Animal Quarantine Station*, 63 *Haw.* 557, 632 *P.*2d 1066, 1071 (1981); *Peloquin v. Calcasieu Parish Police Jury*, 367 *So.*2d 1246, 1251 (La.Ct.App.1979).

In the earliest such decision, an appellate court in Florida authorized mental anguish damages for the owners of a dog that died due to the negligence of their veterinarian. *See Knowles Animal Hosp., supra*, 360 *So.*2d at 38. The court did not rest its decision on the status of a pet as a companion, but instead reasoned that non-economic damages were available because the veterinarian's actions were "of a character amounting to a great indifference to the property of the plaintiffs." *Id.* at 38–39.

In Hawaii, the Supreme Court permitted a claim for negligent infliction of emotional distress for the death of a pet. *See Campbell, supra*, 632 *P.*2d at 1071. In doing so, the court not only defined the elements of the claim applicable to pet owners broadly, which was in conformity with that state's cause of action for negligent infliction of emotional distress in general, but extended the claim well beyond one based on loss of a pet or a companion animal. *Ibid.* As a result, the Supreme Court of Hawaii held that: (1) a plaintiff need not witness the tortious event to recover for negligent infliction of emotional distress; (2) medical testimony about the degree of emotional distress is not necessary as long as the plaintiff can show that the distress was "serious"; and (3) a plaintiff may recover for the emotional distress suffered from the loss of personal property generally. *Id.* at 1068–71.

Finally, an appellate court in Louisiana held that a cat owner could recover for mental distress suffered when the cat was taken by neighbors to a shelter and put to sleep. The court reached this

---

purposes of our common law analysis. Similar statutes introduced in the legislative bodies of other states have not been enacted. *See* Victor E. Schwartz & Emily J. Laird, *Non–Economic Damages in Pet Litigation: The Serious Need to Preserve a Rational Rule*, 33 Pepp. L.Rev. 227, 248–49 (2006).

conclusion, however, without a detailed explanation of the legal support on which its conclusion was based. *See Peloquin, supra,* 367 *So.*2d at 1248, 1251. The decision therefore affords us little assistance in our consideration of the question raised on appeal.

### III.

Our analysis of the question presented by the parties to this appeal first requires that we explain the traditional status accorded in our law to pets. Thereafter, we apply our ordinary framework for determining whether to recognize a new common law cause of action, including our evaluation of the requisite elements of foreseeability and the public policy implications of our decision.

### A.

Animals have traditionally been treated by the law as property. *See Harabes, supra,* 348 *N.J.Super.* at 369–70, 791 *A.*2d 1142 (noting that review of law in this and other jurisdictions demonstrates classification of pets as personal property). Because pets have been regarded as personal property, pet owners were historically restricted to the market value of the animal in addition to any special damages arising from the loss of the animal. *See, e.g., Bunn v. Shaw,* 3 *N.J.* 195, 196, 199, 69 *A.*2d 576 (1949) (affirming award to plaintiff of value of deceased fox hound); *Paguio v. Evening Journal Assoc.,* 127 *N.J.L.* 144, 145, 21 *A.*2d 667 (Sup.Ct. 1941) (awarding damages in excess value of dog for trained dog used in vaudeville routine).

In 1998, however, the Appellate Division recognized that pets are a special variety of personal property. *Hyland v. Borras,* 316 *N.J.Super.* 22, 25, 719 *A.*2d 662 (App.Div.1998). In *Hyland,* the plaintiff sought recovery after defendant's dog entered her yard and caused serious injuries to her dog. *Id.* at 23, 719 *A.*2d 662. The trial court found that a new dog would cost approximately $500, but awarded plaintiff the full amount of veterinary care that was required to treat the dog, for a total of $2,500 in damages. *Id.* at 24, 719 *A.*2d 662. Defendant appealed, arguing that the

proper measure of damages for property if the repair cost exceeds the replacement cost is either the diminution in the value of the property or its replacement cost. *Ibid.*

The Appellate Division affirmed, noting the difficulty of ascertaining the value of companion animals. *Id.* at 25–26, 719 *A.*2d 662. The panel reasoned that "[m]ost animals kept for companionship have no calculable market value beyond the subjective value of the animal to its owner, and that value arises purely as the result of their relationship and the length and strength of the owner's attachment to that animal." *Id.* at 25, 719 *A.*2d 662. Because of the contrast between market value and value to the owner, the court held that "a household pet is not like other fungible or disposable property, intended solely to be used and replaced after it has outlived its usefulness." *Ibid.* Even so, the appellate panel did not permit an enhanced award, but concluded that "defendants [would] be required to 'make good the injury done' as a result of their negligence" by reimbursing plaintiff for the dog's veterinary medical expenses. *Id.* at 25–26, 719 *A.*2d 662 (internal citation omitted).

Most recently, in a different context, the Appellate Division considered the status and value of companion animals in a suit for possession of a dog following a couple's broken engagement. *See Houseman v. Dare,* 405 *N.J.Super.* 538, 539, 966 *A.*2d 24 (2009). The trial court, finding that pets are personal property, refused to order the remedy of specific performance and instead awarded plaintiff $1,500 as representing the pet's value. *Id.* at 539–40, 966 *A.*2d 24. On appeal, the Appellate Division held that pets have a "special 'subjective value' to their owners." *Id.* at 544, 966 *A.*2d 24 (quoting *Hyland, supra,* 316 *N.J.Super.* at 25, 719 *A.*2d 662). Because of that subjective value, the court analogized pets to property such as "heirlooms, family treasures and works of art that induce a strong sentimental attachment." *Id.* at 543, 966 *A.*2d 24 (quoting *Restatement (Second) of Contracts* § 360 comment b) (internal quotations omitted). Therefore, the panel held that agreements by cohabitants about the disposition of a compan-

ion animal may be specifically enforced when that remedy is appropriate. *Id.* at 546, 966 *A.*2d 24.

As these decisions demonstrate, our courts recognize that pets have a value in excess of that which would ordinarily attach to property, because unlike other forms of personal property, they are not fungible. Our courts therefore have permitted pet owners to be awarded costs in excess of the animal's value that represent pecuniary losses associated with medical treatment, damages based on the intrinsic value of the pet, or specific performance of an agreement as between the pet's co-owners.

## B.

Our framework for determining whether to recognize a new common law cause of action, as we have explained, "derive[s] from considerations of public policy and fairness." *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993). More specifically, deciding whether one party owes another a duty of care "involves identifying, weighing, and balancing several factors-the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Ibid.* Underlying all of those considerations, however, is an analysis of whether the harm suffered was foreseeable, for in the absence of foreseeability of harm, the other factors will not be advanced by the imposition of a duty and the outcome will inevitably be unfair.

Foreseeability therefore is an important but not dispositive factor for the Court to consider. *See Carter Lincoln–Mercury, Inc. v. EMAR Grp.,* 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994). In particular, we have recognized its importance to the inquiry in our previous evaluations of applications to expand the parameters of the *Portee* doctrine. *See Dunphy, supra,* 136 *N.J.* at 108, 642 *A.*2d 372. Foreseeability requires a consideration of whether the plaintiff's injury is within the range of harm that emanates from a tortfeasor's negligence. *Carter Lincoln–Mercury, supra,* 135 *N.J.*

at 194, 638 *A*.2d 1288. Applying this standard, we permitted a plaintiff who was engaged to marry and living with the man whose death she witnessed to be within the *Portee* parameters. *See Dunphy, supra,* 136 *N.J.* at 115, 642 *A*.2d 372. We explained that "[o]ne can reasonably foresee that people who enjoy an intimate familial relationship with one another will be especially vulnerable to emotional injury resulting from a tragedy befalling one of them." *Id.* at 109, 642 *A*.2d 372.

 Requiring a significant relationship between the plaintiff and the victim helps to preserve the distinction between ordinary emotional injuries that would be experienced by friends and those that *Portee* recognized as compensable, namely the " 'indelibly stunning' emotional injuries suffered by one whose relationship with the victim 'at the time of the injury, is deep, lasting, and genuinely intimate.' " *Id.* at 109–10, 642 *A*.2d 372 (quoting *Dunphy, supra,* 261 *N.J.Super.* at 123, 617 *A*.2d 1248). Lesser relationships do not suffice because they lack the requisite underpinnings that make foreseeable the severe emotional distress that the bystander suffered, or claims to have suffered, in response to the negligent act.

 Foreseeability is only the first consideration because not all foreseeable risks give rise to duties. *Dunphy, supra,* 136 *N.J.* at 108, 642 *A*.2d 372. The Court must also consider the impact of imposing a duty as a part of our consideration of the public policy implications of our decision. *Ibid.* In evaluating the public policy concerns of creating a duty, we "consider the real-life consequences of imposing a duty and cannot be oblivious of the social realities of the day." *Acuna v. Turkish,* 192 *N.J.* 399, 414, 930 *A*.2d 416 (2007). We have recognized that we "should be reluctant to impose a duty that society is unwilling to accept," and should be cognizant of whether the policy proposed by a party is the subject of controversy and likely to be divisive. *Ibid.* (citing *Kelly, supra,* 96 *N.J.* at 545, 476 *A*.2d 1219). If the Court determines that liability should be extended in any case, then we

must take care to "draw judicial lines based on fairness and policy." *Kelly, supra,* 96 *N.J.* at 544, 476 *A.*2d 1219.

The Appellate Division in this case, the Law Division in *Harabes, supra,* 348 *N.J.Super.* at 371, 791 *A.*2d 1142, the courts of other jurisdictions, and legal commentators have identified many of the potential effects of creating an emotional distress claim in favor of pet owners. As one commentator cataloged them, these implications include concerns about (1) opening the door to claims for non-economic damages for the loss of other types of personal property and thus burdening courts with increased caseloads; (2) the difficulties of determining who would be entitled to recover, the category of companion animals for which recovery would be available, and evaluating "damages [that] are so subjective that they are beyond the capacity of the legal process"; and (3) the impact on the practice of veterinary medicine. *See, e.g., Schwartz, supra,* 33 *Pepp. L.Rev.* at 232–33, 235–40, 249.

 In the end, we decline plaintiff's request that we expand the class of individuals authorized to bring a *Portee* claim by extending it to individuals who have witnessed the traumatic death of a pet for several reasons.

First, we do not doubt that plaintiff was attached to her dog and that she had strong emotional ties to it. Nevertheless, we have strictly limited the kinds of relationships that can support a *Portee* claim precisely because of our intention to preserve the essential principle of foreseeability so as to serve the ends of fairness to all parties. It would make little sense, we think, to permit plaintiff to recover for her emotional distress over the loss of her dog when she would be precluded from any such recovery if she instead had the misfortune of watching the neighbor's child, whom she regarded as her own, torn apart by a wild animal. *Eyrich, supra,* 193 *N.J.Super.* at 259–61, 473 *A.*2d 539. Our carefully limited authorization for *Portee* damages, which would not permit recovery for observing the death of most humans, simply cannot permit recovery for watching the death of a non-human.

Second, expanding the *Portee* cause of action to permit recovery of emotional distress damages based upon the death of a pet would be inconsistent with existing statutes. It would be a clear conflict with the expression of our Legislature in the Wrongful Death Act, *N.J.S.A.* 2A:31–1 to –6. That statutory cause of action limits recovery for wrongful death by survivors to pecuniary damages, regardless of the closeness of consanguinity. *N.J.S.A.* 2A:31–5. Permitting plaintiff to recover emotional distress damages based on the loss of her pet would effectively create a class of pet owners with rights in excess of those the Legislature has granted to family members suffering the loss of another human. Moreover, recognizing the cause of action would conflict with the Legislature's statutory scheme for regulating dog owners and for addressing dangerous dogs, *see, e.g., N.J.S.A.* 4:19–38 (criminalizing the silencing of a dog); *N.J.S.A.* 4:22–20 (defining abandonment of a domestic animal as a disorderly persons offense); *N.J.S.A.* 4:19–16 (setting forth liability of dog owners for injuries inflicted by their dog's bite). To the extent that the imposition of a duty of care through recognizing a tort remedy serves to alter or deter conduct, *see Kelly, supra,* 96 *N.J.* at 548, 476 *A.*2d 1219 (discussing deterrent effect of new cause of action against social hosts who directly serve alcohol to guests whom they know will be driving), our Legislature has not been silent.[3]

Third, we do not question plaintiff's argument that, for many people, their pets are not merely property. That alone, however, cannot support a cause of action for emotional distress damages. Instead, that value is recognized through the precedents that permit the measure of recovery for the loss of the pet to exceed its replacement value and to include the intrinsic value of the pet.

---

[3] Although it would not preclude this Court from recognizing a common law remedy, we note that our Legislature has not enacted bills that have been introduced to create a statutory cause of action for non-economic damages of this type. Assembly Bill No. 2411, 211 Leg., Reg. Sess. (2004); Assembly Bill No.2012, 211 Leg., Reg. Sess. (2004) (introduction of bills that would have permitted recovery of non-economic damages for the loss of a pet, capped at $20,000).

Plaintiff's damage award in this matter, as an illustration, appropriately exceeded even the highest cost that she estimated would be needed to replace the dog with another one.

Fourth, there is no clear line of demarcation that we can draw in order to distinguish which pet owners would qualify for a *Portee* recovery and which would not. Unlike the plain and obvious emotional bond one has to the easily-identified universe of people that to date we have limited to parent, child, spouse or an individual with whom one shares a marital-like or intimate familial relationship, there is no manner in which to identify the class of pet owners or pets that would be included in such a cause of action.

Nor is it sufficient to describe some pets as companion animals, because the descriptive definition of the role played by companion animals, *see supra,* 217–19, 48 *A.*3d at 320–21 (2012) (quoting Squires–Lee, *supra,* 70 *N.Y.U. L.Rev.* at 1065), would equally apply to innumerable human relationships. Surely utilizing that articulation as our basis would suggest that a school teacher, coach, regular babysitter, housekeeper or live-in au pair could claim an equally close bond with a child that would potentially support a *Portee* claim. Moreover, as the same commentator recognizes, our attachment to our pets is uniquely individualized, *see* Squires–Lee, *supra,* 70 *N.Y.U. L.Rev.* at 1065 (conceding that "[e]ach relationship depends on the personalities and nature of the individuals involved"), as a result of which there could be no agreement as to which ones would certainly provoke the requisite level of emotional upheaval, were we to witness their traumatic death, that would be foreseeable and thus entitled to the extraordinary remedy recognized in *Portee* and its progeny.

Fifth, as we have recognized, we consider pets to be unlike property in the traditional sense. However, by not expanding the scope of a *Portee* claim to include their loss, we forestall the argument, raised by some of the commentators, that an expansion of the cause of action would inevitably open the door to claims that attachments to inanimate forms of property should likewise be

honored. Thus, we need not be concerned with future applications by children of long-deceased parents claiming to have strong emotional ties to family heirlooms, photographs or meaningful gifts who would argue that witnessing the destruction of those things entitles them to be compensated for their alleged distress.

In the end, we leave the *Portee* cause of action where we found it. We leave it to serve the limited and specific purposes for which it was designed, permitting it to compensate certain individuals for the traumatic loss of carefully defined classes of other individuals. We perceive no basis in law or in public policy to depart from that meaning of the doctrine or to expand it in the manner that plaintiff requests.

## IV.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER, Justices LaVECCHIA, ALBIN, and PATTERSON—5.

*Not Participating*—Judge WEFING (temporarily assigned).

*Opposed*—None.