**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0787-22

MEGAN STRAYER, individually
and as administratrix ad
prosequendum and general
administratrix of the ESTATE OF
IVAN SCOTT STRAYER,
deceased,

      Plaintiff,

v.

WINGATE AT WYNDHAM,
WINGATE VINELAND,
WYNDHAM WORLDWIDE,
WYNDHAM HOTELS AND
RESORTS, INC., ROTH 55
DEVELOPMENT CORP.,
WINGATE HOTEL,
EDWARD ROTH, HENRY ROTH,
LARRY PULCINE, OSMOSE
UTILITIES SERVICES, INC.,

      Defendants,

and

RICHARD SPERAZZA,

      Plaintiff-Appellant,

v.

WINGATE VINELAND, ROTH 55
DEVELOPMENT CORP.,
EDWARD ROTH, and
HENRY ROTH,

     Defendants-Respondents.

_____

Argued November 29, 2023 – Decided January 19, 2024

Before Judges Vernoia, Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Docket Nos. L-0716-18 and L-0209-20.

Justin Lee Klein argued the cause for appellant (Law Offices of Lorne M. Reiter, LLC, attorneys; Lorne M. Reiter and Laura Catalina Johnson, of counsel; Justin Lee Klein, on the briefs).

Michael J. Rossignol argued the cause for respondents (Riker Danzig LLP, and Golden, Rothschild, Spagnola, Lundell, Boylan, Garubo & Bell, P.C., attorneys; Anthony J. Zarillo, Jr., Michael J. Rossignol, Youngjin Hailey Park, and Rey O. Villanueva on the brief).

PER CURIAM

The single issue presented in this appeal is whether plaintiff Richard Sperazza can recover on a claim for negligent infliction of emotional distress for the emotional harm he suffered upon waking up to find the body of his

murdered friend and co-worker in the hotel room they shared while on a work assignment. Plaintiff appeals from a December 10, 2021 order granting the summary judgment motion of defendants Wingate Vineland, Roth 55 Development Corp., Edward Roth, and Henry Roth (collectively the defendants), and a January 22, 2022 order denying his motion for reconsideration. We affirm.

The facts in this case are not in dispute. Plaintiff was employed by Osmose Utilities Services, Inc. as a technician and worked alongside his friend and roommate, Ivan Scott Strayer, at the time of Strayer's murder. Plaintiff, Strayer, and other utility workers were assigned to work crews and traveled to various locations around the country, living together in hotels while on assignment. According to plaintiff, the crew led by Mark Knowles had worked on five to six different sites before October 2016. Plaintiff and Strayer had been hotel roommates on the prior ten to twelve work assignments. They also socialized frequently outside of work. Plaintiff was the best man at Strayer's wedding. Plaintiff considered Strayer family, knew his wife, and attended his family functions.

Approximately one month before Strayer's murder, plaintiff and other members of the Osmose work crew checked into the Wingate Hotel in Vineland.

3

Knowles always made their hotel reservations and took the lead in making their room assignments. The crew, consisting of five crew members, checked into the hotel together, and included plaintiff, Strayer, Knowles, Charles Pulcine (Chuck), and his brother Larry Pulcine (Larry), who had recently joined the crew. Knowles spoke to the front desk clerk while the remaining crew members provided their identification to the front desk clerk and "wrote on some card . . . who was in which room." The crew members were assigned to three rooms as follows: plaintiff and Strayer were assigned Room 404, the Pulcine brothers were assigned Room 405, and Knowles was assigned Room 406.

On the evening of October 10, 2016, plaintiff had gone to Bennigan's Restaurant, located in front of the hotel, to eat dinner and watch a baseball game. He went alone, but Strayer eventually met him at the restaurant. Strayer left the restaurant and returned to the hotel between 8:00 and 8:30 p.m. while plaintiff stayed to watch the end of the baseball game. When plaintiff returned to their hotel room around 10:00 p.m., he observed the television was on, and Strayer appeared to be sleeping. That same evening plaintiff received a text message from Chuck around 10:03 p.m. inviting him to hang out and drink some beers in his room. At approximately 10:05 p.m., plaintiff went to the Pulcines' room, although he briefly returned to his room to grab a few beers. He did not make

4

any observations of Strayer at that time. He then returned to the Pulcines' room, where he stayed until approximately 11:30 p.m.

While plaintiff was in the Pulcines' room, Larry left for approximately thirty minutes, stating he was going to do laundry, and when he returned, Larry was "shooting his mouth off to [plaintiff] . . . [plaintiff] wasn't in a good mood[,] so [plaintiff] just left." When plaintiff finally returned to his room, he noticed the television was off but did not make any observation of, or hear anything from, Strayer at that time and "[w]ent to bed. . . . [and] didn't turn on the light or anything . . . ."

On October 11, 2016, plaintiff woke up around 5:00 to 5:15 a.m. and Strayer was still in bed, which was unusual because Strayer "was normally up before [plaintiff]." Plaintiff said:

> [I] looked over and . . . saw [Strayer's], eyes were open, but he was not—nothing really going on, you know. So I ran over, grabbed his foot. It was ice cold. And, then I went to—I grabbed his arm and checked his pulse twice. I'll never forget the noise it made. And I . . . panicked so I ran out of the room. Went to Mark's room . . . told him what I saw . . . And, I [] it was wild 'cause I mean, I didn't even think [] I didn't hear anything, didn't see any[.]

5

According to plaintiff, he felt shocked at finding his friend's body and fear for his own safety. Plaintiff later learned Strayer had been shot with a handgun. Plaintiff did not witness the murder and did not encounter the murderer in his hotel room. He was not physically harmed.

Larry was taken into police custody after video surveillance from the hotel's front lobby area revealed that at approximately 10:00 p.m. on October 10, 2016, the Pulcine brothers had entered the lobby and approached the front desk. According to the police report, the front desk clerk on duty at the time created two keycards: one for room 404 and another for room 405 at around 10:00 p.m. and Charles took possession of the keycards from the clerk. According to the keycard access log, the new keycard for Room 404 given to the Pulcines was used to access Room 404 at 10:28 p.m. A responding police detective estimated that Strayer was shot between 10:30 p.m. and 11:30 p.m. while plaintiff was across the hall in Room 405. Larry was subsequently arrested for, charged with, and convicted of Strayer's murder.

Strayer's wife brought a wrongful death and survivorship action under N.J.S.A. 2A:31-2 and 2A:15-3 against defendants, while plaintiff brought a separate action for negligent infliction of emotional distress. Both matters were consolidated and proceeded to discovery where the parties retained liability and

medical experts and took depositions. Strayer's wife's claims have since been settled.

Plaintiff retained an expert on hotel management and operations and a medical expert. His hotel management and operations expert, Kenneth Free, opined that "the Wingate Hotel was aware of its safety obligations and deviated from the industry standard of care that created a foreseeable risk of harm to the hotel's guests." Free explained Larry's criminal acts are the type of criminal activity that adequate safety and security measures are intended to prevent and were, therefore, foreseeable. Free concluded that the failure to identify or properly register the Osmose crew was inconsistent with proper keycard control and resulted in a foreseeable risk of harm to guests, and the implementation and enforcement of a proper keycard control protocol system could have prevented Larry's unauthorized entry into plaintiff's and Strayer's room.

Defendants moved for summary judgment on October 7, 2021. On December 10, 2021, the motion judge heard argument, after which he rendered his decision from the bench. The motion judge found that plaintiff had failed to demonstrate defendants' actions proximately caused plaintiff's emotional injuries. He found plaintiff's injuries were "not based upon the handing of a keycard" and that neither defendants nor their employees "cause[d] any of the

7

emotional distresses being suffered by plaintiff."  He acknowledged that defendants' employee "shouldn't have given the keycard to Mr. Pulcine" but subsequently concluded:

> you know, they were all friends.  They had been in the hotel.  They were seen together and all those things.  It's not like they gave the keycard to a stranger, but putting that all aside, the Defendants here didn't cause, whether negligently, intentionally or recklessly, any of the emotional distress caused—that Plaintiff is now suffering from.

In his brief discussion of the law, the motion judge also relied on Falzone v. Busch, 45 N.J. 559, 561 (1965), to support his causation determination, stating:

> when you come to emotional distress types of claims as, you know, started in this road down with Falzone and its been kind of muddled by subsequent cases, there still has to be the requirement that the [d]efendants are the ones that caused the emotional distress.  And I think that's clear -- made clear in the model jury charge under 3.30.f, that there has to -- it's the plain -- it's the [d]efendants that have to be the cause of the emotional distress.  And I think that's really what Falzone talks about at least initially, not directly, but I mean, I think it's obviously inherent in it that it's the [d]efendants that cause it.

This appeal followed.

## I.

We review a grant of summary judgment de novo, applying the same standard as the trial court.  Samolyk v. Berthe, 251 N.J. 73, 78 (2022).  That

standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the trial court's legal analysis. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018).

> A. Bystander Claim for Negligent Infliction of Emotional Distress.

On appeal, plaintiff argues the motion judge erred by ruling that, as a matter of law, plaintiff's emotional injuries were solely caused by the actions of Larry and that defendants' negligence did not cause his alleged injuries. According to plaintiff, the motion judge erroneously "based [his] grant of summary judgment entirely upon [his] determination that defendants' negligence in giving the keycard to [plaintiff's] hotel room to an unauthorized individual,

who used the keycard to access the room and murder [Strayer], did not proximately cause any emotional distress to [plaintiff]."

Plaintiff continues to assert, as he did at summary judgment, that this case is not a Portee v. Jaffee, 84 N.J. 88 (1980), bystander claim of negligent infliction of emotional distress. Instead, he avers he is entitled to recover based on a theory of direct negligence.

In Portee, our Supreme Court recognized a cause of action for the unique emotional distress suffered by a mother as she watched her seven-year-old son die an excruciating death, trapped in a malfunctioning elevator shaft. 84 N.J. at 91-92. Portee marked a pivotal development in the law, creating an exception that allowed bystanders to recover damages for emotional injuries based on the theory of negligent infliction of emotional distress. The Court considered the facts that police attempted to rescue the child for four and a half hours, and the plaintiff had to endure witnessing her son "moan, cr[y] out, and flail his arms." Ibid. The plaintiff's son eventually died during the rescue attempt, and as a result, the plaintiff "became severely depressed and seriously self-destructive," culminating in an unsuccessful attempt to take her own life, which "required considerable physical therapy and . . . [she] received extensive counseling and

psychotherapy to help overcome the mental and emotional problems caused by her son's death." Ibid.

Plaintiff disputes defendants' contention that the analysis set forth in Portee is applicable. Instead, he maintains defendants owed him a direct duty of care, the same duty of care that was owed to Strayer as a guest of the hotel, there was a breach of the duty of care to him and Strayer, and that breach proximately caused him severe emotional distress.

Defendants frame this issue as one that must be analyzed pursuant to Portee. Confronted with a set of facts where a bystander suffered emotional distress as a result of witnessing the death of her child, the Portee Court set forth a four-factor test for bystander negligent infliction of emotional distress claims: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." Id. at 101. Defendants maintain that plaintiff cannot satisfy an essential element of a Portee claim because plaintiff and Strayer lacked the requisite familial relationship, despite their personal friendship and plaintiff's claim that he considered Strayer family.

11

Defendants further note that our Supreme Court in <u>McDougall v. Lamm</u> reaffirmed <u>Portee</u>'s narrow application to specified relationships, namely "marital or intimate, familial relationship[s]," when it denied the plaintiff recovery for emotional distress suffered as result of witnessing the death of a pet. 211 N.J. 203, 229 (2012). The Court emphasized that <u>Portee</u> claims have been limited to relationships with a "plain and obvious emotional bond," such as between a "parent, child, spouse, or an individual with whom one shares a marital-like or intimate familial relationship[.]" <u>Ibid.</u> Thus, defendants aver the relationship between the co-workers here does not rise to the level required by <u>Portee</u>.

Although we recognize that the relationship between Strayer and plaintiff may be more than that of mere co-workers, it does not rise to the level required by <u>Portee</u>, and we see no basis to relax the Supreme Court's requirement of a "marital-like or intimate familial relationship." <u>McDougall</u>, 211 N.J. at 229. Thus, plaintiff did not, and cannot, establish a claim under <u>Portee</u> for negligent infliction of emotional distress.

B. <u>Direct Claim for Negligent Infliction of Emotional Distress.</u>

Plaintiff concedes he cannot sustain his burden under <u>Portee</u>, but argues the court nonetheless erred in granting defendant summary judgment because he

12

has a direct claim for negligent infliction of emotional distress based on defendants' breach of a duty it owed directly to him. The argument ignores the limited bases supporting a negligent infliction of emotional distress claim.

The Supreme Court in Jablonowski v. Suther, held:

> Generally, then, an individual can maintain an independent tort action for negligent infliction of emotional distress in two instances. A plaintiff can demonstrate that the defendant's negligent conduct placed the plaintiff in reasonable fear of immediate personal injury, which gave rise to emotional distress that resulted in a substantial bodily injury or sickness. See Falzone, 45 N.J. at 569. Alternatively, a plaintiff can state a prima facie claim for negligent infliction of emotional distress by satisfying the four elements set forth in Portee.
>
> [195 N.J. 91, 104 (2008); accord Abousaid v. Mansard Gardens Assocs., LLC, 207 N.J. 67, 76-77 (2011).]

Plaintiff contends he is entitled to recover damages based on a direct claim of negligent infliction of emotional distress that follows traditional negligence analysis, which he claims "can be understood as negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care." Russo v. Nagel, 358 N.J. Super. 254, 269-70 (App. Div. 2003) (quoting Decker v. Princeton Packet, 116 N.J. 418, 429 (1989)).

A-0787-22

Here, plaintiff relies on Falzone, 45 N.J. 559, Strachan v. John F. Kennedy Memorial Hospital, 109 N.J. 523 (1988), and Lascurian v. City of Newark, 349 N.J. Super. 251, 277 (App. Div. 2002). He distinguishes these cases from the Portee line of cases, arguing that defendants owed a duty directly to him—as a guest in their hotel—that included not giving keycard access to his room to any other person. Plaintiff argues that defendants, through their negligent distribution of the keycard, breached a duty owed directly to him, and are therefore liable for his emotional distress damages. Ibid.

Defendants argue that under Falzone's "zone of danger" test, 45 N.J. at 569, plaintiff cannot show he was in imminent fear of harm. In Falzone, the defendant-motorist's car struck the plaintiff's husband, who was standing in a field as the plaintiff sat in her car, which was parked nearby. 45 N.J. at 561. The plaintiff observed the oncoming car, although she was not physically struck or injured. The plaintiff's husband suffered serious injuries as a result of the collision. The plaintiff filed suit, alleging negligent infliction of emotional distress for having witnessed her husband's injuries and because she was also in fear of her own bodily injury as she witnessed the accident. The trial court granted the defendant summary judgment.

14

However, the Court reversed the trial court's grant of summary judgment to the defendant and held a plaintiff could recover for bodily injury or sickness resulting from fear for her own safety caused by a negligent defendant where she was placed in danger by such negligence, although there was no physical impact. Id. at 569.

By eschewing the "prior inflexible requirement of physical impact," Falzone expanded the potential reach of liability for claims for emotional distress "where negligence causes fright from a reasonable fear of immediate personal injury." Ibid.; see also Portee, 84 N.J. at 934. Plaintiff relies on the Court's reasoning and holding in Falzone for the proposition that, like the plaintiff in Falzone, who the Court recognized had been equally "fearful of immediate injury" because of her proximity to her husband when he was struck by the defendant's vehicle, he was in the zone of danger by virtue of sharing the same hotel room and awaking to find the body of his murdered friend and co-worker.

Plaintiff also maintains that the Court's reasoning in Falzone is equally applicable here because although not physically injured, he suffered emotional harm by virtue of being fearful of immediate injury when he realized his roommate and friend was dead in the bed next to him. He, therefore, seeks

reversal of the order granting summary judgment to defendants, arguing that under Falzone, witnesses to harm suffered by others can establish liability on the contention that they were "fearful of immediate injury."

The problem with plaintiff's argument is that Falzone, as the Court recognized in Portee, 84 N.J. at 93, Jablonowska, 195 N.J. at 104, and Abousaid, 207 N.J. at 77, requires a plaintiff to demonstrate "a reasonable fear of immediate personal injury," Falzone, 45 N.J. at 569, and plaintiff has failed to make that showing. Plaintiff understandably may have felt shock and even fear when he discovered his roommate's dead body, but the evidence in the record does not establish he had a "reasonable fear of immediate personal injury." Ibid. To the contrary, plaintiff testified he "didn't even think . . . didn't hear anything, didn't see any[thing]" in the moments after he found Strayer's dead body in the hotel room.

As the record shows, plaintiff was not present when Strayer was murdered, plaintiff did not encounter the murderer in his hotel room, Strayer's body was "ice cold" when plaintiff touched it, and plaintiff was not even aware that Strayer had been murdered until he was so advised by investigating officers later in the day. According to plaintiff's deposition testimony, when he returned to his room the night of the murder, all the lights were off, and he "used [his] phone light to

16

guide [him] to [his] bed so as to not disturb Strayer," whom he believed was sleeping. He then "put [his] phone on the . . . nightstand and [he] crawl[ed] into bed" to go to sleep. It was only when he awoke early the next morning that he saw Strayer was still in bed and eventually realized that something was wrong. He then "ran up to him, grabbed his foot, leg" and "pushed his chest and checked his pulse twice." And, once he realized Strayer was unresponsive, he testified, "obviously, I didn't know what to do" and "didn't know what was [going] on" and "just—ran out." Plaintiff also testified that it was his understanding when he discovered Strayer's body that "he had passed away[, but he] didn't know that he was shot." A police officer called to the scene later told plaintiff, who was then sitting in the hallway, that Strayer had been shot with a handgun. On these facts, plaintiff has not demonstrated that he had a reasonable fear of any personal injury, never mind the requisite "reasonable fear of immediate personal injury." Ibid. see also Jablonowski, 195 N.J. at 104.

Based upon these undisputed facts, we cannot conclude that the principles of liability addressed in Falzone support plaintiff's cause of action. We also consider that based upon plaintiff's own testimony, for all he knew at the time, Stayer could have died from natural causes. He was understandably distraught, confused, and in shock, but those facts do not establish that he was in the zone

17

of danger or reasonably fearful of immediate harm, under the principles explained in <u>Falzone</u>.[1]

Plaintiff concedes that he does not have a claim or cause of action under <u>Portee</u>, and we otherwise conclude he cannot sustain his burden of proving a <u>Portee</u> claim. We also find he cannot otherwise sustain the asserted negligent infliction of emotional distress claim because he failed to present any evidence he suffered a reasonable fear of immediate personal injury under <u>Falzone</u>. <u>See</u> <u>Friedman v. Martinez</u>, 242 N.J. 449, 472 (2020) ("Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[1] Plaintiff's reliance on <u>Strachan</u>, 109 N.J. 523, and <u>Lascurian</u>, 349 N.J. Super. 251, is also misplaced. Those cases address issues not present in this case such as "the duty of health-care providers to turn over to the next of kin a family member's dead body," <u>Strachan</u>, 109 N.J. at 525, the negligent handling of a dead body, <u>id.</u> at 533, and "the mishandling or misuse of a burial plot," <u>Lascurian</u>, 349 N.J. Super. at 276.

A-0787-22