GORDON G. STRACHAN AND MARILYN STRACHAN, HIS WIFE, PLAINTIFFS–APPELLANTS, v. JOHN F. KENNEDY MEMORIAL HOSPITAL AND A.R. PIROLLI, DEFENDANTS–RESPONDENTS.

Argued February 2, 1987—Decided March 16, 1988.

*P. Kay McGahen* argued the cause for appellants (*McGahen & Casey,* attorneys; *Ellen M. Casey,* on the brief).

*Robert J. Partlow* argued the cause for respondents (*Parker, McCay & Criscuolo*, attorneys; *Stacy L. Moore, Jr.*, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal, here as of right because of Judge Long's dissent in the Appellate Division, *R.* 2:2–1(a)(2), poses important issues concerning the duty of health-care providers to turn over to the next of kin a family member's dead body. Plaintiffs' son's body had been maintained on a life-support system, a respirator, even after the parents had demanded that the system be removed, following the unanimous conclusion of several physicians that the young man was brain dead.

A majority of the Appellate Division, reversing a judgment for plaintiffs after jury verdicts, determined that defendants, a hospital and its administrator, were guilty of "no actionable wrongdoing associated with withholding or mishandling the dead body." *Strachan v. John F. Kennedy Memorial Hosp.*, 209 *N.J.Super.* 300, 314 (1986) (footnote omitted). The court below held as well that defendants "had no duty to provide consent forms or to have a procedure for turning off the respirator." *Id.* at 317. Finally, the majority below held that even if defendants owed plaintiffs a duty in the stated circumstances and a breach thereof were demonstrated, plaintiffs' emotional distress damages would be barred by *Portee v. Jaffee*, 84 *N.J.* 88 (1980). *Id.* at 321–22. We affirm in part and reverse in part.

I

Both the majority and dissenting opinions in the Appellate Division may profitably be consulted for their extensive factual recitations, with differing emphases. See 209 *N.J.Super.* at 304–11, and *id.* at 323–27. The pertinent facts may be summarized as follows.

At approximately 4:30 p.m. on Friday, April 25, 1980, twenty-year-old Jeffrey Strachan shot himself in the head in an apparent suicide attempt. He was rushed to John F. Kennedy Memorial Hospital (the Hospital), an acute care facility and one of the defendants in this case. At 5:25 that afternoon Dr. Hummel, the emergency room physician, diagnosed Jeffrey as brain dead. The doctor based his conclusion on several factors, including the absence of spontaneous respiration and reflexive movement, as well as the fact that both pupils were dilated and fixed. Dr. Hummel placed Jeffrey on a respirator.

Examination later that evening by Dr. Cohen, a neurosurgeon and one of the attending physicians, confirmed that Jeffrey was brain dead. The doctor explained that painful reality to plaintiffs and informed them that nothing could be done to restore brain function.

Because the Hospital is actively involved in organ transplants through its affiliate, the Delaware Valley Transplant Program, Dr. Cohen asked plaintiffs to consider donating Jeffrey's organs. He noted on the medical chart that the staff should proceed to "harvest" Jeffrey's organs if the parents gave their permission (the obvious implication being that there was no doubt about Jeffrey's status: he was dead). Because plaintiffs were uncertain about what to do, they deferred a decision and agreed to return in the morning. Jeffrey was then transferred to the intensive care unit, where he was continued on the life support system in order that the organs would remain in a condition for harvesting should the parents' decision be in favor of donation. Jeffrey's parents were allowed to "visit" him in the intensive care unit.

Plaintiffs returned the next morning, Saturday, April 26. They informed a Dr. Pinsler (whose connection with the hospital is not disclosed in the record) of their decision not to donate any of Jeffrey's organs. They also requested that he be taken off the respirator. Dr. Pinsler advised plaintiffs to "think it over some more." Plaintiffs also discussed their request with

Dr. Cohen. When Mr. Strachan asked a nurse when the machine would be turned off, he was informed that the hospital administrator had not given any order for the removal of the machinery, and that the removal could not be effected without such an order.

After speaking with Mr. Strachan that evening Dr. Venkat, also a neurosurgeon and an associate of Dr. Cohen, examined Jeffrey and agreed that the young man was brain dead. He noted plaintiffs' request to turn off the respirator, and indicated on the chart that "as soon as the hospital administrator tells us the procedure, we will do so."

Assistant administrator and nursing director Jeanette Licorice communicated with defendant Pirolli, the hospital administrator, late that same evening. Pirolli in turn called the Hospital's general counsel, Edward Sullivan, for advice. Sullivan suggested that the Hospital obtain plaintiffs' consent for removal of the respirator. He also indicated that the Hospital should run two electroencephalograms (EEGs), twenty-four hours apart, to get a "clear understanding of what the boy's condition is." He suggested to Pirolli that a court order might be obtained as an alternative to a medical decision to turn off the respirator. Another possible solution offered by Sullivan was the convening of a Prognosis Committee to assist the physicians in the decision to pronounce the patient dead.

The results of the two EEGs confirmed that Jeffrey was indeed brain dead. The Hospital authorities did not convene a Prognosis Committee. Dr. Weinstein, also a neurosurgeon engaged in practice with Drs. Cohen and Venkat, made an entry on Jeffrey's chart for Monday, April 28, 1980, indicating: "patient officially brain dead and by hospital regulations we may discontinue respiration c [with] family's permission." Plaintiffs signed a release requesting Jeffrey's removal from life-support systems. The release provided:

We have been advised by the attending physicians of our son, Jeffrey Strachan, that he has been declared "brain dead." It is therefore requested

that all life support-life-support-death devices [sic] be discontinued as soon as possible.

In making this request we are fully aware of our legal responsibilities and further hold harmless John F. Kennedy Memorial Hospital and the attending physicians with regard to discontinuance of life support devices.

At 4:05 p.m., Dr. Weinstein disconnected the respirator. Dr. Santoro pronounced Jeffrey dead and executed a death certificate, after which Jeffrey's body was turned over to his family for burial.

Plaintiffs thereafter instituted this action against the Hospital, administrator Pirolli, the physicians involved, and the Delaware Valley Transplant Program and its representative Stephen Sammut. The action against the physicians, the transplant program, and Sammut was voluntarily dismissed prior to trial, and the case proceeded against the Hospital and administrator Pirolli only. At the conclusion of trial the court instructed the jury on the bases of liability, including *respondeat superior*, under which the Hospital would be liable if Pirolli were found liable. The court then submitted the matter to the jury with special interrogatories, including the following:

1(a) Did defendant, Augustine R. Pirolli, have a duty to have procedures in place for the removal of Jeffrey Strachan from the life support systems when requested by his parents, and willfully and wantonly fail to do so, as alleged by the plaintiffs?

\*       \*       \*       \*       \*       \*       \*       \*

2(a) Did the defendant, Augustine R. Pirolli, have a duty to have procedures in place for the removal of Jeffrey Strachan from the life support systems when requested by his parents, and negligently failed to do so, as alleged by the plaintiffs?

2(b) Was this failure a proximate cause of the infliction of additional severe emotional stress upon the plaintiffs?

3(a) Did the defendant, Augustine R. Pirolli, willfully and wantonly hold the body of Jeffrey Strachan so as to prevent his proper burial?

\*       \*       \*       \*       \*       \*       \*       \*

4(a) Did the defendant, Augustine R. Pirolli, negligently hold the body of Jeffrey Strachan so as to prevent his proper burial?

4(b) Did this holding result in additional mental distress to the plaintiffs?

The jury responded affirmatively to both parts of questions 2 and 4, and awarded plaintiffs $70,000 each, for total verdicts of $140,000. As indicated, a divided Appellate Division reversed.

## II

The foregoing interrogatories, which track the trial court's charge, suggest that there were two separate causes of action, based on separate duties owed by defendants to plaintiffs, on which the jury could make separate determinations: one resting on a duty to have in place procedures for the removal of plaintiffs' son from the life-support system on plaintiffs' request, the other based on a duty to release to the parents their son's dead body. This was error. The circumstances of the case projected but one duty: to act reasonably in honoring the family's legitimate request to turn over their son's body.

Quite apart from the substantive question of whether courts should impose on hospitals a duty to have certain procedures in place is the problem of the trial court's having left to the jury the issue of whether such a duty exists. A prerequisite to recovery on a negligence theory is a duty owed by defendant to plaintiff. *Mergel v. Colgate-Palmolive-Peet Co.*, 41 *N.J.Super.* 372, 379 (App.Div.), certif. den., 22 *N.J.* 453 (1956); W.P. Keeton, D. Robbs, R. Keeton, & D. Owens, *Prosser & Keeton on Torts* § 53 at 357 (5th ed. 1984) [hereinafter *Prosser*]. Although the jury in this case was asked to determine whether defendants were under such a duty, the question of whether a duty exists is a matter of law properly decided by the court, not the jury, *e.g., Essex v. New Jersey Bell Tel. Co.*, 166 *N.J.Super.* 124, 127 (App.Div.1979), and is largely a question of fairness or policy. "The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Kelly v. Gwinnell*, 96 *N.J.* 538, 544 (1984) (quoting *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578, 583 (1962)).

We are disinclined, as a matter of sound public policy, to announce an absolute duty, henceforth to be adhered to by all affected hospitals, to have in place *procedures* for the removal of a dead body from a life-support mechanism on the request of the next of kin. *Cf. Kirker v. Orange County,* 519 *So.*2d 682 (Fla.Dist.Ct.App.1988) (Allegations of negligence against defendant county, of which medical examiner's office was an agency, charging failure to provide proper procedures for corneal removal and failure to generate and maintain accurate records of such procedures "do not rise to level of willful, wanton or malicious behavior such as would sustain an action for emotional distress."). The imposition of a paperwork duty does little to advance either the mission of health-care providers or the needs of society. If "procedures" are to be viewed as more than mere "paperwork" and considered indispensable in this area—in the nature of a standard that governs the medical community—then those procedures should be designed and imposed by those most directly involved, the physicians and hospitals themselves. That is the business of the medical community itself, not of this Court.

That is not to say, however, that the absence of such procedures may not be relevant on the issue of whether these defendants fulfilled the obligation that surely they had: to act reasonably in the face of plaintiffs' request to turn over the body. Plaintiffs produced an expert, Dr. Jerene Robbins, whom the trial court found to be "qualified as a medical doctor, and qualified to give opinions in regard to hospital administration." Dr. Robbins testified that in the circumstances that confronted defendant Pirolli, it was "unthinkable" that there were no forms for the parents to sign to effectuate release of the body, and that if the hospital did not have such forms, then Pirolli "should have on the instant arranged some kind of writing that he could provide for the hospital in order that releases could be signed." We take the expert's testimony to mean that if a hospital is going to insist on forms and procedures, then it should have them available and in place, or at the least impro-

vise them on the spot, in order to fulfill its underlying obligation to take reasonable steps to release the body to the next of kin.

That there is such an underlying obligation is no longer open to question. For more than half a century this state has recognized a *quasi* property right in the body of a dead person. "[I]t is now the prevailing rule * * * that the right to bury the dead and preserve the remains is a *quasi* right in property, the infringement of which may be redressed by an action in damages." *Spiegel v. Evergreen Cemetery Co.,* 117 *N.J.L.* 90, 93 (Sup.Ct.1936). We pause to record our agreement with a commentator's observation about the "somewhat dubious" nature of a property right to the body. *Prosser, supra,* at 63. "It seems reasonably obvious that such 'property' is something evolved out of thin air to meet the occasion, and that in reality the personal feelings of the survivors are being protected, under a fiction likely to deceive no one but a lawyer." *Ibid.* The problem may be avoided by recognizing the obvious: the tort contemplates the wrongful infliction of mental distress. *Ibid.; see Restatement (Second) of Torts* § 868 comment a (1977); Annotation, *Liability for Withholding Corpse,* 48 *ALR* 3d 240, 252–53 (1973). However it may be denominated, the cause of action is firmly in place.

Although the Appellate Division recognized that cause of action as a *quasi* property right, the majority held that recovery could not be allowed here because Jeffrey was not legally dead until Monday, April 28, at 4:10 p.m., when he was officially pronounced dead, the respirator was turned off, and the death certificate was signed. 209 *N.J.Super.* at 314. It was then that Jeffrey's body was turned over to plaintiffs for burial.

Plaintiffs' right of recovery, then, depends on when Jeffrey's death occurred. Jeffrey was pronounced brain dead by the emergency room physician at 5:25 p.m. on Friday. That assessment was confirmed by a neurosurgeon that evening, and again confirmed by other doctors and by the results of additional

testing throughout the weekend. The evidence is overwhelming that Jeffrey was deemed brain dead considerably earlier than Monday at 4:10 p.m. when Dr. Santoro pronounced him dead and executed a death certificate. Thus the question comes down to whether our legal definition of death should include brain death.

Traditionally, death was defined as the irreversible cessation of cardiopulmonary function. *In re Quinlan*, 70 *N.J.* 10, 26–27 *cert. den. sub nom. Garger v. New Jersey*, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976). This definition, however, came under attack as failing to reflect advances in medical technology. Because cardiac and respiratory activity can be mechanically maintained for some time, definitions of "death" have increasingly focused on the cessation of brain functions. *See* Comment, *Law at the Edge of Life: Issues of Death and Dying*, 7 *Hamline L.Rev.* 431 (1984) [hereinafter *Law at the Edge*]. Once the brain is dead, no technology exists to restore its function.

Technological advances have also made possible the performance of organ transplants on a regular basis. For organs to be preserved for transplant, the donor's cardiopulmonary system must continue functioning until the organs can be removed. Under the traditional definition of death, such a donor would be considered as still alive because the heart continues to beat and the lungs continue to perform the respiratory function. In a very real sense, then, a break from the traditional definition of death is a necessary condition to the existence of transplant programs, for otherwise the organ-removal process might be deemed to have "killed" the donor. *See* Schwartz, *Bioethical and Legal Considerations in Increasing the Supply of Transplantable Organs: From UAGA to "Baby Fae,"* 10 *Am.J.L. & Med.* 397, 416 (1985) [hereinafter *Bioethical and Legal Considerations*].

In response to these concerns, many states have adopted new definitions of death, incorporating brain death. The Uniform Determination of Death Act (UDDA) provides:

§ 1. [Determination of Death]

An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards.

12 *U.L.A.* 236 (Supp.1983) (reprinted in *President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life–Sustaining Treatment* at 9 n. 7 (1983)). By 1985, thirteen states and the District of Columbia had adopted the UDDA. *Bioethical and Legal Considerations, supra,* 10 *Am.J.L. & Med.* at 418. One recent survey estimates that at least thirty states have adopted statutory definitions of death that include cessation of brain function. *Law at the Edge, supra,* 7 *Hamline L.Rev.* at 457, Appendix A. In the criminal context, our Appellate Division adopted a definition equating death with brain death. *State v. Watson,* 191 *N.J.Super.* 464, *certif. den.,* 95 *N.J.* 230 (1983). *Watson* held that the defendant was properly convicted under our homicide statute for causing the brain death of his victim. 191 *N.J.Super.* at 466.

We therefore conclude that section one of the UDDA provides the appropriate legal definition of death. That some of the developments in refining that definition and implementing it elsewhere came to pass after the critical events of the case before us is of small moment, given this Court's 1976 reference in *Quinlan,* with obvious approval, to "brain death" as satisfying the criterion for "death" and as "representing * * * prevailing and accepted medical standards." See 70 *N.J.* at 27–28. We therefore conclude that there was ample support in the evidence for the jury's conclusion that defendants had "negligently [held] the body of Jeffrey Strachan so as to prevent his proper burial." (Answer to Interrogatory 4(a).)

### III

Our next inquiry is whether the limitations on tort claims for emotional distress bar plaintiffs from recovering for

defendant's breach of duty. The argument advanced by plaintiffs in support of that claim, fully supported by the evidence, begins with the assertion that the doctors considered Jeffrey "dead" immediately after they concluded that he was brain dead. In fact, on Friday night Dr. Cohen asked plaintiffs to consider donating Jeffrey's organs. Thereafter, the doctor made a notation in the medical chart that the staff should proceed to harvest Jeffrey's organs if his parents signed the consent form. Thus, there can be no doubt that on deeming Jeffrey brain dead, the doctors considered Jeffrey "dead." The failure of defendants to honor the family members' request posed a plain affront to their dignity and autonomy and exposed them to unnecessary distress at a time of profound grief.

The record in this case reveals particularly compelling evidence of distress. Although plaintiffs were told that their son was brain dead and nothing further could be done for him, for three days after requesting that their son be disconnected from the respirator plaintiffs continued to see him lying in bed, with tubes in his body, his eyes taped shut, and foam in his mouth. His body remained warm to the touch. Had Jeffrey's body been removed from the respirator when his parents requested, a scene fraught with grief and heartache would have been avoided, and plaintiffs would have been spared additional suffering.

In the face of the foregoing evidence the majority below, applying the four factors that this Court set forth in *Portee v. Jaffee, supra,* 84 *N.J.* 88, concluded that even if it could be determined that defendants had violated some duty owed to plaintiffs, recovery should be denied here. 209 *N.J.Super.* at 321–22. The dissent concluded that *Portee* did not apply and that recovery was appropriate under standard negligence principles. *Id.* at 333–46.

In *Portee,* a mother witnessed her child's suffering and eventual death as he lay trapped in a faulty elevator. This Court followed the lead of the California Supreme Court in

*Dillon v. Legg,* 68 *Cal.*2d 728, 441 *P.*2d 912, 69 *Cal.Rptr.* 72 (1968), in granting recovery to one who was not directly affected by defendant's negligence but instead was a witness to another's injury. We set out four factors to be used in determining whether recovery was appropriate:

(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress. [84 *N.J.* at 101.]

Because factors one and three were clearly not present here, the majority below concluded that recovery under the *Portee* doctrine should be precluded.

The error of that conclusion lies in the mistaken assumption that the *Portee* criteria were intended to cover all emotional distress actions. As Judge Long so persuasively argued in her dissent below, the *Portee* factors were intended to limit recovery where the plaintiff suffers distress from witnessing an accident resulting from the breach of a duty owed another. The issue as framed in *Portee* is simply inapposite here: "whether a parent can recover damages for the emotional anguish of watching her young child suffer and die in an accident caused by defendant's negligence." 84 *N.J.* at 90.

Because Jeffrey was no longer alive, defendants breached no duty owed him by their failure to turn off the respirator. Jeffrey suffered no harm as a result of defendants' negligence. Plaintiffs' distress, therefore, was not the result of witnessing another's injury, but rather the result of a breach of duty owed directly to plaintiffs. Perhaps the confusion stems from the fact that the duty owed to plaintiffs related to the handling of Jeffrey's body, but that does not render this a "bystander" case. If, for example, a hospital negligently reported to a patient's parents that the patient's condition was considerably worse than in fact it was, the parents' distress would flow from the breach of a duty owed to them, not one owed to their child. *See, e.g., Molien v. Kaiser Found. Hosps.,* 27 *Cal.*3d 916, 616 *P.*2d 813, 167 *Cal.Rptr.* 831 (1980) (recognizing broader stan-

dard of foreseeability for direct victim whose wife was negligently and incorrectly diagnosed as having syphilis, leading to the destruction of the marriage); *cf. Hume v. Bayer*, 178 *N.J.Super.* 310 (Law Div.1981) (parents of boy with mildly infected appendix could recover for intentional infliction of emotional distress resulting from being told, knowingly and maliciously, that condition was cancerous).

Application of the *Portee* criteria to all emotional distress cases would preclude recovery when a plaintiff's distress is the "direct" result of defendant's negligence. Obviously, when a third party has not been injured, the first and third *Portee* factors can never be satisfied. These *Portee* factors, however, limit recovery for emotional distress only in the "bystander" cases, and only when defendant's duty to the bystander originates in a duty to a third party.

In *Falzone v. Busch*, 45 *N.J.* 559, 561 (1965), this Court allowed recovery of emotional-distress damages where defendant's vehicle negligently veered in the plaintiff's direction. *Falzone* eliminated the longstanding requirement of physical impact as a prerequisite to recovery for emotional distress. Again, application of the *Portee* limitations would have precluded recovery in the *Falzone* "direct" action. Instead, *Falzone* limited recovery to those within the "zone of danger," and held that immediate fear of physical injury was within that zone. *Id.* at 569. In *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 76 (1966), we characterized the zone of risk as coincident with foreseeability.

*Caputzal* and *Falzone* also contemplated an additional limitation on recovery for emotional distress. Although those cases abandoned the physical impact rule, they continued to contemplate "substantial bodily injury or sickness" resulting from the fright caused by defendant's negligence. *Caputzal, supra,* 48 *N.J.* at 73, 76; *Falzone, supra,* 45 *N.J.* at 569; *see also Prosser, supra,* § 54 at 361 ("Where the defendant's negligence causes only mental disturbance, without accompanying physical injury,

illness or other physical consequences, * * * the great majority of courts still hold that in the ordinary case there can be no recovery.").

The requirement of physical injury is grounded on the notion that emotional distress claims are too easily fabricated without such a limitation. *Prosser, supra,* § 54 at 361. Finding that rationale insufficient to withhold recovery for distress claims that might prove legitimate, an increasing number of courts have abandoned the physical-injury limitation altogether. *E.g., Molien v. Kaiser Found. Hosps., supra,* 27 *Cal.*3d 916, 616 *P.*2d 813, 167 *Cal.Rptr.* 831 (1980); *Rodrigues v. State,* 52 *Hawaii* 156, 472 *P.*2d 509 (1970); *see Prosser, supra,* § 54 at 364–65 n. 59 (collecting cases that have abandoned this limitation). In *Portee,* this Court joined those who have abandoned the physical injury requirement for plaintiffs who witness the injury of another. 84 *N.J.* at 101.

Other courts have carved out an exception to the physical-injury rule in cases for which there is "an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Prosser, supra,* § 54 at 362. Two exceptions have generally been recognized: the first involves negligent transmission of a message concerning a relative, and the second pertains to negligent mishandling of a corpse. Note, *Negligent Infliction of Emotional Distress: Reconciling the Bystander and Direct Victim Causes of Action,* 18 *U.S.F.L.Rev.* 145, 147–48 (1983). Thus, in *Muniz v. United Hosps. Medical Center Presbyterian Hosp.,* 153 *N.J.Super.* 79 (1977), the Appellate Division held that the plaintiffs, parents of a child who had been pronounced dead but whose body was misplaced by the hospital for three weeks, could bring an action for negligent infliction of emotional distress. Our decision in *Berman v. Allan,* 80 *N.J.* 421 (1979), is an example of a case not within these two exceptions but in which recovery was nonetheless allowed without proof of physical injury because the circumstances of a distress claim seemed unmistakably genuine.

Plaintiffs were allowed recovery for the distress they suffered as a result of defendant's negligent failure to inform them of the availability of a procedure known as amniocentesis, which would have indicated that their fetus, if not aborted, might be born with Down's Syndrome. Again, recovery was not conditioned on any showing that the parents were physically injured as a result of their distress. 80 *N.J.* at 434.

We need not decide today whether *Portee's* abandonment of the physical injury requirement for emotional distress claims should extend to all "direct" claims for emotional distress. We need look no further than the long-recognized exception for negligent handling of a corpse, *see Muniz, supra,* 153 *N.J.Super.* at 80, or the especial likelihood that this claim is genuine, *see Berman, supra,* 80 *N.J.* at 433–34, to conclude that plaintiffs need not demonstrate any physical manifestations of their emotional distress here. The result at trial was consistent with the stated principles.

### IV

We have determined that there was ample evidence to support the jury's conclusion that defendants violated their duty to honor plaintiffs' legitimate request to turn over their son's dead body. So much of the Appellate Division judgment as reversed the trial court judgment in favor of plaintiffs on that claim is reversed. Because we do not recognize a separate cause of action based on defendants' failure to have had in place procedures for the removal of life-support systems, we affirm so much of the judgment below as upset the trial-level judgment in plaintiffs' favor on that claim.

Ordinarily that would result in our reinstating the jury verdict of $70,000 for plaintiffs on the first-stated claim. Under the circumstances, however, we can have no confidence in the assumption that had the jurors been properly instructed on a single cause of action rather than on two separate and distinct negligence claims, they would have concluded that the total

recoverable damages amounted to $70,000. We therefore remand for a retrial on damages only on the claim for failure to have released the dead body.

Judgment affirmed in part, reversed in part. The cause is remanded to the trial court for retrial on damages only, consistent with this opinion.

O'HERN, J., concurring in part, dissenting in part.

I concur in the majority's well-reasoned analysis of the major substantive issues in the case. I cannot be "completely confident" that the improper submission to the jury of an invalid theory of liability (i.e., failure of a hospital to promulgate written procedures for physicians making medical decisions) did not affect the jury's resolution of the hospital administrator's liability for the delay in releasing the body. *See Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229, 245, 432 *A.*2d 925, 933 (1981) (uncertainty about basis of jury verdict warrants retrial of issues). Hence, I would order a retrial on all issues.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*Concurring in part and dissenting in part*—Justice O'HERN—1.