**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1226-19

MARIO QUESADA,

     Plaintiff-Appellant,

v.

COMPASSION FIRST PET
HOSPITALS and RED BANK
VETERINARY HOSPITAL,[1]

     Defendants-Respondents.

_____

Argued March 15, 2021 – Decided April 1, 2021

Before Judges Fasciale and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-2597-19.

Morgan M. Browning argued the cause for appellant.

---

[1] Veterinary Services of New Jersey, P.C., d/b/a Red Bank Veterinary Hospital and Veterinary Specialists of North America, LLC, d/b/a Compassion First Pet Hospital, I/P/A Compassion First Pet Hospital and Red Bank Veterinary Hospital was incorrectly pled as Compassion First Pet Hospitals and Red Bank Veterinary Hospital.

Mary Beth Ehalt argued the cause for respondents (Law Offices of Linda S. Baumann, attorneys; Mary Beth Ehalt, of counsel and on the brief; Jessica Kim, on the brief).

PER CURIAM

Plaintiff appeals from a September 24, 2019 order dismissing his claims with prejudice for failure to state a claim upon which relief may be granted, and a November 21, 2019 order denying his motion for reconsideration. Plaintiff asserts that the motion judge applied the incorrect line of negligent infliction of emotional distress cases, classifying his claim against Veterinary Services of New Jersey (VSNJ) as a "bystander" liability claim instead of a "direct" liability claim, and that the motion judge erred in dismissing his remaining negligence and bailment claims. We agree with plaintiff, reverse and remand for further proceedings consistent with this opinion.

In June 2014, a veterinarian diagnosed plaintiff's cat Amor with hyperthropic obstructive cardiomyopathy[2] and began receiving treatment. On

---

[2] Hyperthropic cardiomyopathy is "one of the most commonly encountered heart disease in cats" and is "is characterized by an abnormal thickening . . . of one or several areas of the walls of the heart, usually of the left ventricle." Eric de Madron, Hyperthropic Cardiomyopathy in Cats, Am. Coll. of Veterinary Internal Medicine (2004) https://www.acvim.org/Animal-Owners/Animal-Education/Health-Fact-Sheets/Cardiology/Hypertrophic-Cardiomyopathy-in-Cats.

June 25, 2017, Amor became sick and was "completely limp" with ragged breathing. Plaintiff transported Amor to the Red Bank Veterinary Hospital (RBVH), where a veterinarian explained that Amor had "saddle thrombus,"[3] which necessitated euthanization. Plaintiff, who was overcome with emotion, was permitted to say goodbye to Amor. After Amor passed, plaintiff "was loudly crying and exclaiming to [RBVH] staff how Amor had saved his family when [his] sister died." A nurse brought plaintiff Amor's body wrapped in a towel, which plaintiff began speaking and singing to for some time before the veterinarian came to retrieve the body.

The veterinarian informed plaintiff that during the euthanization, Amor bit one of the nurses and, pursuant to state law, a "brain tissue sample" was required to determine whether Amor had rabies. Plaintiff provided the veterinarian with Amor's vaccination records and explained that Amor was "strictly an indoor cat" that was "never outdoors or outside of plaintiff's

---

[3] Saddle thrombus, or "feline aortic thromboembolism (FATE) . . . is a serious and sometimes fatal heart disease in cats" that "affects as many as [twenty-five percent] of cats with hyperthropic cardiomyopathy[.]" Saddle Thrombus: Aortic Blood Clots in Cats, CatHealth, https://www.cathealth.com/cat-health/cardiovascular/2194-aortic-thromboembolism-in-cats (last visited Mar. 1, 2021). "FATE occurs when a blood clot forms, usually in the heart, then breaks loose" and subsequently "enters the circulation but eventually gets stuck, causing a blockage." Id.

apartment or even walked on a leash or left alone on the streets." Plaintiff requested that the RBVH veterinarian speak with Amor's primary veterinarian, which the RBVH veterinarian refused to do. The veterinarian also refused to review the vaccination records plaintiff provided. Plaintiff asked the veterinarian to relay this information to the nurse who Amor bit later expressed her appreciation and relief.

The veterinarian informed plaintiff that Amor's body would be released the following day to the Hamilton Pet Meadow for cremation per plaintiff's request. Plaintiff informed the veterinarian that he intended to display Amor's body for viewing prior to cremation. Plaintiff paid the veterinary bill and signed the necessary documents authorizing Amor's cremation, but "[a]t no time did the [RBVH] veterinarian or any other staff disclose anything to [plaintiff] other than that the law required a brain tissue sample be sent for rabies testing."

On June 26, 2017, the veterinarian left plaintiff a voicemail informing him that Amor's body could not be released until the rabies testing was complete. Plaintiff returned the veterinarian's phone call and they spoke about Amor's illnesses and the delay in cremation. At no point did the veterinarian explain to plaintiff what a "brain tissue sample" entailed.

4

On June 28, 2017, RBVH contacted plaintiff to confirm that Amor had returned a negative rabies test result and that his body was being released to the Hamilton Pet Meadow. Plaintiff again requested a personal viewing of the body, which the RBVH employee made a note of and simultaneously advised plaintiff to speak with the Hamilton Pet Meadow. After speaking with the Hamilton Pet Meadow, plaintiff scheduled Amor's viewing for June 30, 2017.

At Amor's viewing, plaintiff discovered that Amor had been decapitated. Plaintiff called RBVH demanding to know why he was not informed that Amor would be decapitated, and an RBVH employee referred plaintiff to the New Jersey Department of Health (DOH) and provided him Amor's case number. The DOH confirmed that Amor's head had already been disposed of as medical waste. Plaintiff became extremely emotional, and went "into a state of shock, crying and screaming in Hamilton Pet Meadow in front of staff and clientele" and "told anyone in earshot what [RBVH] had done[.]" Plaintiff called the local police department and requested to be connected to grief counseling services. The police department sent two officers to check on plaintiff before determining that he was in no immediate danger but provided him with counseling hotline phone numbers before leaving.

5

Plaintiff again called RBVH to ask why he was not informed that Amor would be decapitated, and his head disposed of in the process of the rabies testing. A RBVH employee informed plaintiff that "there were ways to take a brain tissue sample without decapitating the body, but that [RBVH] always simply 'sends the whole head.'" Plaintiff was not informed that there were alternate ways for a brain tissue sample to be taken to test for rabies or that the head could be returned after the testing was completed. The employee informed plaintiff that "the reason the veterinarian and [RBVH] concealed the truth of the nature of the test was that 'doctors don't usually tell people because they think the animal is going for cremation, and they don't want to upset anyone.'"

The Veterinary Procedures for Handling Rabies Situations (Veterinary Procedures for Rabies) states that "[i]n situations where the animal owner is upset that his/her pet will be decapitated for rabies testing, practitioners can remove the brain, submit it for testing, and return the body of the animal to the owner in (almost) intact condition."[4] At no point did RBVH offer plaintiff this option.

_____

[4] <u>Veterinary Procedures for Handling Rabies Situations</u>, <u>New Jersey Department of Health</u> 2 (June 2017), https://www.nj.gov/health/cd/documents/topics/rabies/pro_handling_rabid_animals.pdf. We may consider "allegations in the complaint, exhibits attached to

As a result of the decapitation, plaintiff "developed a suite of severe mental health problems . . . such as . . . the need for ongoing professional counseling and medications, insomnia, the inability to work, outbursts of anger, flashbacks, hypervigilance, panic attacks, nightmares, depression and anxiety, suicidal ideation, and impulses toward self-harm," among other health issues.

On June 29, 2019, plaintiff filed his complaint consisting of one count of negligent infliction of emotional distress, six counts of negligence, and one count of bailment. On August 20, 2019, VSNJ filed a motion to dismiss for failure to state a claim pursuant to Rule 4:6-2(e).

On September 13, 2019, the motion judge conducted oral argument, and on September 24, 2019, dismissed plaintiff's complaint with prejudice. Plaintiff subsequently filed a motion for reconsideration on October 14, 2019, which the judge denied.

On appeal, plaintiff raises the following points for this court's consideration:

POINT I

THE [MOTION JUDGE] APPLIED THE WRONG
LEGAL STANDARD IN ANALYZING THE

---

the complaint, matters of public record, and documents that form the basis of a claim." Banco Popular N. Am., 184 N.J. at 183 (citation omitted). As a document published by the DOH, it is a "matter of public record."

SUFFICIENCY OF PLAINTIFF'S CLAIM: PLAINTIFF'S [NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS] CLAIM FALLS UNDER THE "DIRECT DUTY" LINE OF [NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS] CASES, RATHER THAN THE SUBSET OF CASES WHERE A PLAINTIFF MAY RECOVER FOR WITNESSING THE DEATH OF A LOVED ONE (SO-CALLED "BYSTANDER LIABILITY" CASES.)[.]

POINT II

PLAINTIFF HAS A VALID DIRECT NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM.

POINT III

PLAINTIFF'S OTHER CAUSES OF ACTION SHOULD HAVE SURVIVED A MOTION TO DISMISS.

This court reviews a motion judge's grant of a motion to dismiss for failure to state a claim de novo. Wrenden v. Township of Lafayette, 436 N.J. Super. 117, 124 (App. Div. 2014). The court's review "'is limited to examining the legal sufficiency of the facts alleged on the face of the complaint[,]' and, in determining whether dismissal under Rule 4:6-2(e) is warranted, the court should not concern itself with plaintiff['s] ability to prove [his] allegations." Id. at 124-25 (first alteration in original) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)).

We must "assume the facts as asserted by plaintiff are true" and give plaintiff "the benefit of all inferences that may be drawn in [his] favor." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 166 (2005) (quoting Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 192 (1988)). Plaintiff must plead "facts and . . . some detail of the cause of action[,]" something more than conclusory allegations to support his complaint. Printing Mart-Morristown, 116 N.J. at 768. If "a generous reading of the allegations does not reveal a legal basis for recovery[,]" the motion to dismiss should be granted. Edwards v. Prudential Prop. & Cas. Co., 357 N.J. Super. 196, 202 (App. Div. 2003).

I.

We begin by addressing plaintiff's first contention that the motion judge applied the wrong legal standard by analyzing plaintiff's negligent infliction of emotional distress as a "bystander" negligent infliction of emotional distress claim, as established in Portee v. Jaffee, 84 N.J. 88 (1980), and limited in McDougall v. Lamm, 211 N.J. 203 (2012), as opposed to a "direct" negligent infliction of emotional distress claim. Defendants reiterate their contention that the motion judge properly analyzed plaintiff's claim as a "bystander" claim which is barred by McDougall.

9

"Our courts have recognized two types of tortious conduct that support a claim for negligent infliction of emotional distress." Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 236 (App. Div. 2014). First, "'[a] claim of direct, negligent infliction of emotional distress,' can exist where the plaintiff claims proximately-caused damages as a result of the breach of a duty owed by the defendant." Ibid. (quoting Lascurain v. City of Newark, 349 N.J. Super. 251, 277 (App. Div. 2002)). Second, a bystander claim of negligent infliction of emotional distress "first recognized in Portee . . . exists if the plaintiff witnessed the death or serious physical injury of another, with whom he shares a marital or intimate, familial relationship, as the result of the defendant's negligence." Ibid. (citing McDougall, 211 N.J. at 214-15).

In Portee, plaintiff's seven-year-old son became trapped between the outer door and wall of an elevator shaft, which dragged him as it rose to the third floor of the apartment building. 84 N.J. at 91. Plaintiff watched for four and a half hours while her son "moaned, cried out and flailed his arms" as police officers attempted to free him. Ibid. Officers were unable to rescue plaintiff's son, who "died while still trapped, his mother a helpless observer." Ibid. As a result, plaintiff "became severely depressed and seriously self-destructive," culminating in an attempt to take her own life. Ibid. Plaintiff required surgery

to repair the wound from the attempted suicide, and afterwards "required considerable physical therapy and . . . received extensive counseling and psychotherapy to help overcome the mental and emotional problems caused by her son's death." Id. at 91-92.

The trial judge rejected plaintiff's liability claim, and the Court directly certified the case and reversed. Id. at 90. The Court articulated a four-factor test for bystander negligent infliction of emotional distress claims: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." Id. at 101. These claims have been limited to relationships with a "plain and obvious emotional bond" such as between a plaintiff and a "parent, child, spouse or an individual with whom one shares a marital-like or intimate familial relationship[.]" McDougall, 211 N.J. at 229.

In McDougall, the Court declined to extend Portee to circumstances where a plaintiff witnessed the death of a pet. Id. at 230. There, plaintiff was walking her small dog when a larger dog belonging to a defendant ran out from defendant's house and "grabbed plaintiff's dog by the neck, picked it up and

shook it several times before dropping it and returning to defendant's yard." Id. at 208. Plaintiff alleged that "as a result of witnessing the events up to and including the dog's death, she suffered significant and continuing emotional distress and discomfort and demanded damages for that emotional distress." Id. at 209. The Court affirmed the trial judge's dismissal, finding that there was not sufficient foreseeability for such a claim, id. at 227, that it was inconsistent with existing statutory causes of action, id at 228, that damages would exceed the value of the pet, id. at 228-29, that allowing such a claim would unreasonably expand the reach of bystander liability, id at 229, and that permitting recovery for witnessing the death of a pet would "open the door to claims that attachments to inanimate forms of property should likewise be honored," id. at 229-230.

In contrast, a direct claim of negligent infliction of emotional distress "can be understood as negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a legal duty to exercise reasonable care." Decker, 116 N.J. at 429. To establish a direct claim of negligent infliction of emotional distress, a plaintiff must establish "(a) defendant owed a duty of reasonable care to plaintiff; (b) defendant breached that duty; (c) plaintiff suffered severe emotional distress; and (d) defendant's breach of duty was the proximate cause of the injury." Russo v. Nagel, 358 N.J. Super. 254, 269 (App.

Div. 2003) (citing <u>Decker</u>, 116 N.J. at 429). "Whether the defendant has a duty of care to the plaintiff depends on whether it was foreseeable that the plaintiff would be seriously, mentally distressed." <u>Id.</u> at 269-70 (citing <u>Decker</u>, 116 N.J. at 429).

Plaintiff cites <u>Strachan v. John F. Kennedy Mem'l Hosp.</u>, 109 N.J. 523 (1988), for support for his proposition that his claim is properly characterized as a "direct" negligent infliction of emotional distress claim. In <u>Strachan</u>, plaintiffs brought a direct liability negligent infliction of emotional distress claim against a hospital after the hospital failed to remove their son, who had been declared brain-dead, from life support upon request for three days, resulting in "unnecessary distress at a time of profound grief." <u>Id.</u> at 534. In failing to remove their son from life support upon request, plaintiffs were forced to "continue[] to see [their son] lying in bed, with tubes in his body, his eyes taped shut, and foam in his mouth." <u>Ibid.</u> The trial judge applied <u>Portee</u> and determined that even if it could be said that there had been some violation of a duty owed to plaintiffs, they are not entitled to recover for their emotional distress. <u>Ibid.</u>

The Supreme Court reversed as to the application of <u>Portee</u>. The Court acknowledged that the trial court proceeded under "the mistaken assumption that

13

the Portee criteria were intended to cover all emotional distress actions." Id. at 535. The Portee factors "were intended to limit recovery where the plaintiff suffers distress from witnessing an accident resulting from the breach of a duty owed another," ibid., and "only when defendant's duty to the bystander originates in a duty to a third party," id. at 536. But in Strachan, because plaintiffs' child was already deceased, defendants did not breach a duty owed to him by failing to remove him from life support upon plaintiffs' request. As a result, "[p]laintiffs' distress . . . was not the result of witnessing another's injury, but rather the result of a breach of duty owed directly to plaintiffs." Ibid.

Here, similar to Strachan, plaintiff's cat was already deceased, and his distress resulted from the handling of his cat's body, failure to inform him of the possibility of pursuing alternative procedures for testing for rabies aside from decapitation, and disposing of his cat's head prior to returning the body for the viewing. And as a result, this case is distinguishable from McDougall because plaintiff is not asserting that he suffered severe emotional distress from witnessing his cat in serious pain and ultimately dying. Plaintiff's severe emotional distress occurred only upon viewing the cat's decapitated body at the Hamilton Pet Meadow. Plaintiff's negligent infliction of emotional distress claim does not fall under "bystander" liability as enunciated in Portee and is

therefore not barred by <u>McDougall</u>. As a result, we must determine whether plaintiff has stated a direct claim of negligent infliction of emotional distress.

II.

We next address whether, when analyzing plaintiff's negligent infliction of emotional distress claim as a "direct" claim, plaintiff's complaint states a claim upon which relief may be granted.

As previously noted, to establish a "direct" claim of negligent infliction of emotional distress, a plaintiff must establish "(a) defendant owed a duty of reasonable care to plaintiff; (b) defendant breached that duty; (c) plaintiff suffered severe emotional distress; and (d) defendant's breach of duty was the proximate cause of the injury." <u>Russo</u>, 358 N.J. Super. at 269 (citing <u>Decker</u>, 116 N.J. at 429). "Whether the defendant has a duty of care to the plaintiff depends on whether it was foreseeable that the plaintiff would be seriously, mentally distressed." <u>Id.</u> at 269-70 (citing <u>Decker</u>, 116 N.J. at 429). "[L]iability should depend on the defendant's foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted." <u>Gupta v. Asha Enterprises, L.L.C.</u>, 422 N.J. Super. 136, 151 (App. Div. 2011) (quoting <u>Decker</u>, 116 N.J. at 429).

"The severity of the emotional distress raises both questions of law and fact. Thus, the judge decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." Innes, 435 N.J. Super. at 237 (quoting Lascurian v. City of Newark, 349 N.J. Super. 251, 278 (2002)). A plaintiff's emotional distress "must be sufficiently substantial to result in physical illness or serious psychological sequelae." Ibid. (quoting Aly v. Garcia, 333 N.J. Super. 195, 204 (App. Div. 2000)). Our courts have suggested that "lack of sleep, aggravation, headaches, and depression" are insufficient as a matter of law to demonstrate emotional distress without sufficient documentation. Ibid.; see Buckley v. Trenton Sav. Fund. Soc., 111 N.J. 355, 368-69 (1988) (noting that loss of sleep, aggravation, headaches, and nervousness without evidence of severity is insufficient to establish that the mental distress was sufficiently severe); Juzwiak v. Doe, 415 N.J. Super. 442, 453 (App. Div. 2010) (noting that "weight loss, sleeplessness, anxiety and depression" without "some objective documentation" is insufficient to establish severity of emotional distress).

RBVH owed plaintiff a duty to return his cat's body in an acceptable condition for the viewing at the Hamilton Pet Meadow. It was foreseeable that plaintiff would have a serious mental reaction to seeing his cat's decapitated

body upon arrival at the viewing. After the veterinarian euthanized Amor, plaintiff was given the opportunity to say goodbye, where he was "loudly crying and exclaiming to staff how Amor had saved his family when [his] sister died." Plaintiff also held Amor's body, "spoke to him[] and sang to him" before the veterinarian had to take the cat's body away. This emotional reaction combined with the fact that RBVH was twice on notice that plaintiff wanted to have a viewing of his cat's body prior to cremation establishes that defendants owed plaintiff a duty.

Defendants breached their duty to plaintiff, disregarding this foreseeable serious mental distress, by decapitating plaintiff's cat without fully informing him of possible alternative testing procedures or requesting that the decapitated head be returned intact after testing, which is an available procedure. The Veterinary Procedures for Rabies provides that "[i]n situations where an animal owner is upset that his/her pet will be decapitated for rabies testing, practitioners can remove the brain, submit it for testing, and return the body of the animal to the owner in (almost) intact condition." Instead, a technician at RBVH told plaintiff after the fact that "doctors don't usually tell people [about the decapitation] because they think the animal is going for cremation, and they don't want to upset anyone." Defendants were already on notice of the severe

17

emotional reaction plaintiff had to the passing of his cat, and that he intended to have a showing of the cat's body at the Hamilton Pet Meadow. However, defendants failed to properly inform plaintiff of the typical procedure of decapitating the cat for rabies testing, failed to inform plaintiff of the alternative testing procedure to decapitation, and failed to request that the cat's head be returned after decapitation and prior to the showing.

Plaintiff asserts that as a result of seeing his cat's decapitated body, he has suffered from, among other things, "the need for ongoing professional counseling and medications, insomnia, the inability to work, outbursts of anger, flashbacks, hypervigilance, panic attacks, nightmares, depression and anxiety, suicidal ideation, and impulses toward self-harm[.]" Courts have found that loss of sleep and depression without further documentation are insufficient to show serious emotional distress; however, these cases did so at a juncture beyond the pleading stage. See DeAngelis v. Hill, 180 N.J. 1, 20-21 (summary judgment motion); Buckley, 111 N.J. at 368 (motion for judgment notwithstanding the verdict); Innes, 435 N.J. Super. at 237 (Rule 4:37-2(b) motion); Juzwiak, 415 N.J. Super. at 453 (motion to quash a subpoena). Whether or not plaintiff will be able to prove with further documentation that he suffered these illnesses is yet to be determined because there has been no discovery in this case. We "must

assume the truthfulness of the allegations contained in plaintiff['s] complaint[]," Edwards, 357 N.J. Super. at 202, and "not concern [ourself] with plaintiff's ability to prove [his] allegations," Wrenden, 436 N.J. Super. at 125 (quoting Printing Mart-Morristown, 116 N.J. at 746). To that end, plaintiff has pleaded a direct claim of negligent infliction of emotional distress sufficient to withstand a motion to dismiss for failure to state a claim.

## III.

Finally, plaintiff asserts that the motion judge erred in dismissing his remaining negligence and bailment. Defendants assert that plaintiff has not established the elements necessary for a negligence claim, denies that plaintiff's cat has a replacement value, and denies that a bailment relationship exists. As to plaintiff's bailment claim, defendants first assert that while the cat was in their possession, they acted in accordance with the agreement between them and plaintiff regarding the handling of the cat's body. Second, defendants assert that plaintiff's pleading of such a claim necessarily defeats his other negligent infliction of emotional distress claims because it "is an admission that [plaintiff] believes that the cat is simply property[.]"[5]

---

[5] Pleading in the alternative does not prevent plaintiff from stating a claim upon which relief may be granted. Rule 4:5-6 permits pleading in the alternative, and

A negligence cause of action has four elements: "(1) a duty of care, (2) a breach of that duty, (3) actual and proximate causation, and (4) damages." Jersey Cent. Power & Light Co. v. Melcar Utility Co., 212 N.J. 576, 594 (2013). "In most negligence cases, the plaintiff is not required to establish the applicable standard of care." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014). Instead, "[i]t is sufficient for [the] plaintiff to show what the defendant did and what the circumstances were," wherein the jury would be "competent to determine what precautions a reasonably prudent [person] in the position of the defendant would have taken." Id. at 406-07 (first and second alteration in original) (quoting Sanzari v. Rosenfeld, 34 N.J. 128, 134 (1961)).

Plaintiff asserts that defendants owed him a duty, which they breached, as to failing to take reasonable precautions to prevent animal bites at their facility, failing to obtain plaintiff's informed consent to decapitate his cat in order to test for rabies, failing to inform plaintiff of the alternative procedures that could have been utilized, and failing to inform plaintiff that his cat's head had been removed and not returned for the viewing at Hamilton Pet Meadow. He has sufficiently pleaded that defendant's actions caused the harm alleged, that he

the sufficiency of one claim combined with an insufficiency in an alternative does not render a pleading insufficient.

suffered damages, and <u>McDougall</u> does not prevent defendant's recovery as to these claims. Plaintiff has therefore sufficiently stated claims of negligence to withstand a motion to dismiss for failure to state a claim.

"A bailment may be created by contract, either express or implied, or by operation of law or statute." <u>LaPlace v. Briere</u>, 404 N.J. Super. 585, 598 (App. Div. 2009). A bailor-bailee relationship is created "when a person leaves his chattel on the premises of another 'if the latter is given primary control of the chattel for the time being.'" <u>Ibid.</u> (quoting <u>Moore's Trucking Co. v. Gulf Tire & Supply Co.</u>, 18 N.J. Super. 467, 469-70 (App. Div. 1952)). "Inherent in the bailment relationship is the requirement that the property be returned to the bailor, or duly accounted for by the bailee, when the purpose of the bailment is accomplished, or that it be kept until it is reclaimed by the bailor." <u>Ibid.</u> (quoting 8A <u>Am. Jur. 2d. Bailments</u> § 1 (1997)). Where the subject of a bailment is either not returned, returned damaged to the bailor, or is lost, "the bailor may be able to recover under theories of either conversion or negligence." <u>Id.</u> at 600. After a plaintiff establishes that a bailor-bailee relationship exists and that there was a loss of goods while the goods were in the bailee's possession, "a presumption of negligence arises, requiring the bailee to come forward with evidence to show

21

that the loss did not occur through its negligence or that it exercised due care."

Jasphy v. Osinski, 364 N.J. Super. 13, 19 (App. Div. 2003).

Plaintiff asserts that by leaving his cat's body with RBVH, a bailor-bailee relationship was created, and defendant's "fail[ure] to prevent the avoidable loss of [the cat's] head, and . . . fail[ure] to secure the return of [the cat's head] where recovery was possible" violated that relationship. Defendant acknowledges that plaintiff's cat was within their possession with plaintiff's consent, and their purpose was to return plaintiff's cat in a condition sufficient for a showing at Hamilton Pet Meadow, which plaintiff made known multiple times. Defendant had the capability of ensuring that plaintiff's cat was tested for rabies in such a way that the entire body would be returned but failed to inform plaintiff of that possibility despite plaintiff clearly informing RBVH that he intended to have a showing of his cat's body prior to cremation. Because plaintiff placed his cat's body in defendant's primary control and defendant returned it in a damaged condition, plaintiff adequately pleaded a claim of bailment.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION